**Emily MALONE d/b/a Precision Cabinet Company, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 88–1021.**

United States Court of Appeals, Federal Circuit.

June 16, 1988.

J. Hatcher Graham, Clarke, Moore, Daly & Graham, of Warner Robins, Ga., argued, for appellant.

Sharon Y. Eubanks, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for appellee. With her on the brief, were James M. Spears, Acting Asst. Atty. Gen. and David M. Cohen, Director. Also on the brief, were Maj. Scott Bagley and Maj. Leo Wegemer, U.S. Air Force, Washington, D.C., of counsel.

Before RICH, NIES, and BISSELL, Circuit Judges.

BISSELL, Circuit Judge.

Emily Malone d/b/a Precision Cabinet Company (Malone) appeals the decision of the Armed Services Board of Contract Appeals (ASBCA) upholding the government's decision to terminate Malone's contract for default. *Emily Malone d/b/a Precision Cabinet Co.*, ASBCA Nos. 30383, 30384, 87–2 BCA ¶ 19,758 [available on WEST-LAW, 1987 WL 41055], *aff'd on reconsideration*, 87–3 BCA ¶ 19,962. We reverse [available on WESTLAW, 1987 WL 40779].

BACKGROUND

The Air Force awarded Malone a contract to paint and refurbish 265 houses at Robins Air Force Base in Warner Robins, Georgia. Malone received a notice to proceed on October 18, 1983.

The contract required Malone to complete and the government to accept Malone's work on an initial house (exemplar) as a means of establishing workmanship standards before Malone commenced work on other houses. Malone prepared and painted the exemplar, and the contracting officer (CO) inspected it on December 6, 1983. The CO had certain difficulties with Malone's performance on the exemplar, including the paint color and the coats of paint used. However, the CO merely stated that he wanted time to consider possible changes. Malone, on the other hand, was eager to get to work. The parties, therefore, reached a compromise under which Malone would immediately go to work preparing carport support columns at 65 houses while the CO considered the changes.

The CO testified that he did not accept the exemplar. Malone, however, believed that the CO had accepted it. Therefore, immediately after completing work on the carport columns in late December 1983, Malone began to work on the houses themselves. The CO contributed to Malone's perception that he had accepted the exemplar in two ways: (1) by failing to object to Malone's continued performance even though the CO knew what Malone was doing, and (2) by continuing until June 1984 to pay invoices for work performed by Malone.

The contract required surface preparation for painting to include sanding of "bare spots" to eliminate abrupt changes in paint thickness. Malone interpreted "bare spots" to mean places where bare wood or metal showed through surrounding paint. This interpretation, which Malone employed in working on the exemplar, led Malone to sand about 15% of the surface areas painted. Nevertheless, the CO found this sanding work unacceptable, and so communicated with Malone by several letters and in person between February and June 1984. In response, Malone stated that it understood the exemplar set the standard of workmanship for the contract and expressly requested whether that standard had changed. Malone also asked for the government's interpretation of "bare spots." The CO refused to respond to either question.

Finally, by letter dated June 15, 1984, the CO stated that he had never accepted the exemplar. He also explained the government's interpretation of "bare spots" to be the existence of any peeled paint even if the peeling did not disclose the original surface. The CO informed Malone that no further payments would be made until Malone took acceptable corrective action. By June 1984, however, Malone had completed about 70% of the work under the contract using the exemplar as its workmanship standard.

Malone refused to re-perform its previous work, but it did try to find a surface preparation acceptable to the government. It succeeded in doing this in early August 1984. This method involved sanding nearly 100% of the surface area. On approving this method, the CO directed Malone to re-perform its earlier work in this way. This would have involved removing the paint already applied, and sanding virtually 100% of the surface area instead of the 15% Malone sanded when relying on the exemplar as its workmanship standard. Malone insisted that it had done the work already performed consistent with the terms of the

contract by complying with the workmanship standard of the exemplar, and refused to re-perform. The government, therefore, terminated the contract for default on November 9, 1984. Malone appealed this action to the ASBCA.

The ASBCA held that Malone had a duty to perform in the face of a dispute absent a material breach of contract by the government, and that no such breach occurred here. Therefore, it denied Malone's appeal. Malone subsequently appealed to this court.

## ISSUES

1. Whether the ASBCA had jurisdiction to entertain Malone's appeal when Malone had not submitted a claim for money relating to the default termination.

2. Whether the ASBCA erred in holding that the government properly terminated its contract with Malone for default.

## OPINION

### I

The government contends that the ASBCA had no jurisdiction to hear Malone's appeal because Malone did not first submit a claim for money to the CO, but merely asked the ASBCA to determine the propriety of the termination for default. According to the government, Malone's appeal is in the nature of a request for declaratory relief, which the ASBCA has no power to grant.

In support of the government's assertion, the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 605(a), 607(d) (1982), provides that all *contractor* claims must be submitted in writing to the CO in order for a board of contract appeals (BCA) to have jurisdiction. It is undisputed that Malone never submitted a written monetary claim to the CO relating to the default termination.

This case, however, concerns a *government* claim against a contractor. Caselaw supports the proposition that a government decision to terminate a contractor for default is a government claim. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 764–65 (Fed.Cir.1987) (discussing BCA practice of treating termination for default as government claim, and relying in part on this premise to hold that government bears burden to prove validity of default termination); *Z.A.N. Co. v. United States*, 6 Cl.Ct. 298, 305–06 (1984) (holding that default termination is government claim); *James Reedom, d/b/a J & M Electronic*, ASBCA No. 30226, 85–1 BCA ¶ 17,879, at 89,566 [available on WESTLAW, 1985 WL 16514] (explaining that CO decision to terminate contract for default was government claim within meaning of CDA).[1]

This position follows directly from the language of the CDA. The only guidance Congress provided concerning the definition of a government claim exists in the language of section 605(a), which states that "[a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer." A default termination falls precisely within the contours of this language. The government issues it by CO decision, and it is both adverse to the contractor and relates to the contract because it involves a determination that the contractor has failed to fulfill its contractual duties.

The CDA states that a contractor may appeal a government claim to the appropriate BCA without having to submit a monetary claim of its own to the CO. 41 U.S.C. §§ 605(a), 607(d). Because the default termination in this case was a government

---

1. The Claims Court has also held to the contrary. *Gunn–Williams v. United States*, 8 Cl.Ct. 531, 534–35 (1985) (stating that simple default termination is not government claim); *see Industrial Coatings, Inc. v. United States*, 11 Cl.Ct. 161, 162–64 (1986) (holding that direct access suit concerning propriety of default termination is request for declaratory relief over which Claims Court has no jurisdiction). These decisions turn on the Claims Court's unique jurisdictional statute, the Tucker Act, 28 U.S.C. § 1491 (1982). According to these precedents, because the Tucker Act empowers the Claims Court only to enter money judgments, the court has no jurisdiction to decide merely if a default termination is proper. *Industrial Coatings*, 11 Cl.Ct. at 163–64; *see Gunn–Williams*, 8 Cl.Ct. at 534–35.

claim, Malone properly appealed it without first submitting its own claim to the CO.

Notwithstanding this, the government still contends that the ASBCA lacked jurisdiction over this case. The government states that the CDA authorizes the BCAs "to grant any relief that would be available to a litigant asserting a contract claim in the United States Claims Court." 41 U.S. C. § 607(d). Because the Claims Court has held that it does not have jurisdiction over the validity of a default termination absent a claim for money by either a contractor or the government, *see supra* note 1, the government contends that the ASBCA does not have jurisdiction over this case.

This court has not yet considered, nor does it now consider, the validity of the Claims Court precedent just noted. We are here concerned with only deciding whether the CDA grants the BCAs jurisdiction over default terminations absent a monetary claim by the parties. For the following reasons, we hold that it does.

First, the BCAs have historically accepted appeals from a CO's decision terminating a contract for default before either the government or the contractor submitted a monetary claim related to the termination. *Lisbon*, 828 F.2d at 764. If the government later demanded damages related to the termination, the BCAs treated this as a separate claim. *Id.* at 764 n. 7.

There is nothing in the CDA or its legislative history to suggest that Congress intended to restrict this practice. In fact, Congress in the CDA actually expanded the BCAs' jurisdiction. Formerly, the BCAs only had jurisdiction to hear disputes concerning contract interpretation, and could not decide breach of contract issues. The CDA, however, broadened the BCAs' jurisdiction to permit those tribunals to hear all disputes relating to a contract, including breach of contract issues. S.Rep. No. 1118, 95th Cong., 2d Sess. 5, 19, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5239, 5253. Far from supporting the government's view that Congress intended to restrict the BCAs' prior exercise of jurisdiction, this evidence suggests that Congress countenanced an expansion of the

BCAs' jurisdiction. *Michael M. Grinberg*, DOTBCA No. 1543, 87–1 BCA ¶ 19,573, at 98,981 [available on WESTLAW, 1987 WL 40627]; *Varo, Inc.*, DOTBCA No. 1695, 87–1 BCA ¶ 19,430, at 98,229–31 [available on WESTLAW, 1986 WL 20323].

Second, in section 607(e) of the CDA Congress expressly stated that the BCAs "shall provide to the fullest extent practicable, informal, expeditious, and inexpensive resolution of disputes." The legislative history discloses that Congress intended the BCAs "to provide a swift, inexpensive method of resolving contract disputes." S.Rep. No. 1118, 95th Cong., 2d Sess. 12, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5246; *see Dewey Electronics Corp. v. United States*, 803 F.2d 650, 655–56 (Fed.Cir.1986) (discussing CDA legislative history concerning congressional intent that BCAs function as efficient and inexpensive fora for resolving contract disputes). It is hardly consistent with this congressional purpose to forbid the BCAs to decide the validity of a default termination until some undetermined later date when the government assesses reprocurement costs.

Third, this case is analogous to *Nuclear Research Corp. v. United States*, 814 F.2d 647 (Fed.Cir.1987), and the reasoning of that decision applies here. In *Nuclear Research*, the CO terminated a contract for default. *Id.* at 649. Three months later, the CO issued a decision demanding that the contractor return certain unliquidated progress payments. *Id.* The contractor appealed both decisions to the ASBCA. *Id.* On appeal to this court, the government argued that the ASBCA did not have jurisdiction to consider the validity of the default termination because it did not involve a claim for money. *Id.* We held that the ASBCA properly exercised jurisdiction over the default termination and the progress payment issues. *Id.* We explained that the default termination issue was inextricably linked to the government's monetary claim for return of progress payments, and therefore, that the ASBCA had jurisdiction to consider the validity of the default. *Id.*

This case is no different. The issue of the validity of a default termination is "money oriented." *See Williams Int'l Corp. v. United States,* 7 Cl.Ct. 726, 731 (1985). As in *Nuclear Research,* the question here is inextricably linked to the financial liability of both the government and the contractor. If the default was proper, the contractor is liable for the government's excess reprocurement costs. If the default was improper, the government is liable for the contractor's termination for convenience costs. *Z.A.N. Co.,* 6 Cl.Ct. at 305 (explaining financial consequences of proper and improper default terminations). Because this case is analogous to *Nuclear Research,* that holding supports our conclusion that the ASBCA had jurisdiction to consider the validity of Malone's termination for default.

Fourth, practical considerations support our conclusion here. According to the government, a contractor cannot contest the validity of a default termination unless either the government demands excess reprocurement costs, or the contractor claims termination for convenience costs. Under this theory, if the government incurs no excess reprocurement costs, and the contractor incurs no termination for convenience costs, the contractor has no opportunity to contest the validity of the default termination. That the government may debar a contractor that has been default terminated, 48 C.F.R. § 9.406–2(b) (1987), further highlights the impracticality of the government's position.

For the stated reasons, we hold that the ASBCA had jurisdiction to consider the validity of Malone's default termination apart from any monetary claim by either Malone or the government relating to the termination.

## II

The ASBCA denied Malone's appeal of the default termination because the contract's Disputes clause required Malone to proceed diligently with performance in the face of a dispute, and Malone failed to do this. 87–2 BCA ¶ 19,758, at 99,965–66. The ASBCA properly recognized, however, that Malone's failure to perform would be excused and the termination for default would be improper if the government had materially breached the contract. *Id.* at 99,966; *see Seven Sciences, Inc.,* ASBCA No. 21079, 77–2 BCA ¶ 12,730 [available on WESTLAW, 1977 WL 2226]. Because the ASBCA found insufficient evidence to conclude that the government's conduct in this case amounted to a material breach, it denied Malone's appeal. 87–2 BCA ¶ 19,758, at 99,966.

■ In our view, the government materially breached this contract. According to Restatement (Second) of Contracts § 241(e) (1981), "the extent to which the behavior of [a] party failing to perform ... comports with standards of good faith and fair dealing" is a significant factor in determining whether that party's breach is material. The Restatement also states that "[s]ubterfuges and evasions violate the obligation of good faith," as does lack of diligence and interference with or failure to cooperate in the other party's performance. *Id.* § 205 comment d; *cf. Lewis–Nicholson, Inc. v. United States,* 550 F.2d 26, 32, 213 Ct.Cl. 192 (1977) (holding that government-caused delay in contractor performance violated implied duty not to hinder performance of other party); *Peter Kiewit Sons' Co. v. United States,* 151 F.Supp. 726, 731, 138 Ct.Cl. 668 (1957) (explaining that in every government contract there is an implied obligation on part of the government not to willfully or negligently interfere with contractor's performance).

The CO was evasive when he did not clearly state on inspecting the exemplar in December 1983, whether or not he accepted it. He further misled Malone to rely on the exemplar as a workmanship standard by failing to object to Malone's continued performance, by continuing to make progress payments to Malone, and by refusing until June 1984, to answer Malone's explicit question concerning whether the standard of workmanship had changed. The CO's evasive conduct misled Malone to perform roughly 70% of its contractual obligation in reliance on a workmanship standard the CO found unacceptable. In light of the

CO's evasiveness, and the consequent interference this caused in Malone's performance, the government's conduct in this case rises to the level of a material breach of contract.

This breach provides Malone with a legal right to avoid the contract, discharges Malone's duty to perform, and relieves Malone of the default termination and its consequences. *Brand S Roofing*, ASBCA No. 24688, 82–1 BCA ¶ 15,513, at 76,958 [available on WESTLAW, 1981 WL 7191]. The Termination for Default clause in Malone's contract, moreover, automatically converts Malone's wrongful default termination into a termination for convenience.

## CONCLUSION

For the reasons above, we hold that the ASBCA had jurisdiction over the propriety of Malone's default termination apart from a claim for a specific sum by either Malone or the government relating to the termination. On the merits, we reverse the ASBCA and conclude that because the government improperly defaulted Malone, the default is converted into a termination for convenience.

REVERSED.