22 F.3d 1103
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 HTC INDUSTRIES, INC., Appellant,
v.
Les ASPIN Secretary of Defense, Appellee.
 No. 93-1304.
 United States Court of Appeals, Federal Circuit.
 March 7, 1994.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined April 15, 1994.
 
 Before NEWMAN, MICHEL, and RADER, Circuit Judges.
 DECISION
 RADER, Circuit Judge.
 
 
 1
 HTC Industries, Inc. (HTC) appeals the decision of the Armed Services Board of Contract Appeals. The Board denied HTC's claim for an equitable adjustment in contract price. HTC Indus., ASBCA No. 40562, 93-1 B.C.A. (CCH) p 25,560 at 127,312, aff'd on recons., 93-2 B.C.A. (CCH) p 25,701 (1992). Because substantial evidence supports the Board's decision, this court affirms.
 
 DISCUSSION
 Jurisdiction
 
 2
 This court reviews only final decisions of the boards of contract appeals. 28 U.S.C. Sec. 1295(a)(10) (1988). The Government questions this court's jurisdiction in this case because the Board remanded for resolution of quantum issues.
 
 
 3
 Under the Contract Disputes Act, the Board reviews decisions of contracting officers. 41 U.S.C. Sec. 607(d) (1988). Therefore, to discern the finality of board decisions, this court examines the scope of the contracting officer's decision. Teller Envtl. Sys., Inc. v. United States, 802 F.2d 1385, 1389 (Fed.Cir.1986). This court does not apply a strict finality requirement to board appeals. Garrett v. General Elec. Co., 987 F.2d 747, 751 (Fed.Cir.1993).
 
 
 4
 In this case, the CO's decision did not reach the quantum issues remanded by the Board. The CO only considered whether HTC should prevail on its claim for an equitable adjustment. The Board affirmed the CO's denial of entitlement to an adjustment. The Board fully addressed the CO's decision and issued a final ruling on it. Therefore, this court can review this final judgment of the Board.
 
 
 5
 Moreover, this court's Rule 27(e) states that "[a] motion to dismiss for lack of jurisdiction ... should be made as soon after docketing as the grounds therefor are known." The Board decision containing the remand issued on October 30, 1992. This case was docketed on April 15, 1993. The Government first raised this jurisdictional issue in a brief filed in this court on September 13, 1993.
 
 Authority of the Technical Representative
 
 6
 Mr. Levy, the Contracting Officer Technical Representative (COTR) lacked authority to modify HTC's contract price, quantity, quality, or delivery schedule. The contract itself expressly noted the limits of Mr. Levy's authority. Federal Acquisition Regulation (FAR) Sec. 52.232-20(e) (Limitation of Cost Clause), referenced in the contract, states: "No notice, communication, or representation ... from any person other than the Contracting Officer, shall affect this contract's estimated cost to the Government." 48 C.F.R. Sec. 52.232-20(e) (1992). HTC's contract at Section G, contained the following:
 
 
 7
 NOTE: NO DIRECTION, INSTRUCTION OR INFORMATION, EMANATING FROM THE COTR ... WHICH MAY MODIFY THE SCOPE OF WORK UNDER THIS CONTRACT, CHANGE THE ESTIMATED COST OF THE WORK UNDER THE CONTRACT, OR TIME OF PERFORMANCE THEREUNDER, SHALL BE BINDING ON THE GOVERNMENT UNLESS A PRIOR AUTHORIZED INSTRUMENT OR MODIFICATION TO THIS CONTRACT IS DULY ISSUED BY THE CONTRACTING OFFICER.
 
 
 8
 HTC also received a copy of Mr. Levy's COTR appointment letter, which explicitly stated his limitations. The letter, addressed to Mr. Levy, stated: "Your authority, under this appointment, authorizes you to take any and all actions ... PROVIDED such actions DO NOT involve a change in price, quantity, quality, or delivery schedule."
 
 
 9
 Explicit, unambiguous language in a contract controls the dealings between the parties. Parties to a contract must be able to rely on clear statements of their rights and obligations in a contract. As the Board decision aptly stated, this case is "a classic example of why contracts are put in writing." HTC Indus., 93-1 B.C.A. (CCH) at 127,312.
 
 
 10
 Implied actual authority to bind the Government in contract may exist under certain circumstances. H. Landau & Co. v. United States, 886 F.2d 322 (Fed.Cir.1989). However, in the instant case, the words of the Supreme Court in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380 (1947) govern:
 
 
 11
 [A]nyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.
 
 
 12
 Id. at 384. In this case, the Board found: "Dr. Couch was admittedly aware of the express written limitations on Mr. Levy's authority, as well as the specific terms of the 'Limitation of Cost' clause." HTC Indus., 93-1 B.C.A. (CCH) at 127,305. The record amply supports this finding.
 
 Knowledge of the Contracting Officer
 
 13
 HTC also claims that the Government did not timely respond to its cost overrun proposal. FAR Sec. 32.704 states that upon learning of an approaching cost overrun, the CO shall promptly obtain funding information and notify the contractor in writing. 48 C.F.R. Sec. 32.704(a)(1) (1992). The CO did not send HTC any notice of an impending cost overrun. HTC, however, was also delinquent. FAR Sec. 52.232-20(b) states that the contractor shall notify the CO in writing when there is reason to believe that the costs will exceed seventy-five percent of the estimated cost of the contract. 48 C.F.R. Sec. 52.232-20(b)(1) (1992). HTC submitted no bimonthly progress reports between February 11, 1986 and July 28, 1986. During that period, HTC's costs exceeded seventy-five percent of the estimated cost. HTC did not, however, send its cost overrun proposal to the Contracting Office until August 12, 1986.
 
 
 14
 Thus, this case does not fall within the rule enunciated in Malone v. United States, 849 F.2d 1441 (Fed.Cir.1988). In Malone, the CO's evasive conduct misled a contractor. The contractor then performed seventy percent of its contractual obligation in reliance on a workmanship standard the CO later found unacceptable. This court held that the Government materially breached its implied obligation to refrain from interfering with the contractor's performance. In this case, however, HTC knew or should have known that the COTR could not change the contract's price, quantity, quality, or delivery schedule. The Board properly found that no authorized officer of the Government misled HTC.
 
 Estoppel
 
 15
 HTC also alleges estoppel because the Government acquiesced in HTC's understanding of the contract and induced HTC to continue performance. Office of Personnel Management v. Richmond, 496 U.S. 414 (1990), does not apply in this suit where HTC is not "claim[ing] entitlement contrary to statutory eligibility criteria." Burnside-Ott Aviation Training Ctr., Inc. v. United States, 985 F.2d 1574, 1581 (Fed.Cir.1993). Estoppel has four elements:
 
 
 16
 (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury.
 
 
 17
 JANA, Inc. v. United States, 936 F.2d 1265, 1270 (Fed.Cir.1991), cert. denied, 112 S.Ct. 869 (1992).
 
 
 18
 Again, explicit knowledge, as found by the Board, prevails over HTC's assertions after the fact. The Board found:
 
 
 19
 The correspondence does indicate quite clearly however, that at least as of 20 February 1987 Dr. Couch was not operating under any illusion that reimbursement was to be expected.
 
 
 20
 HTC Indus., 93-1 B.C.A. (CCH) at 127,304. Therefore, HTC was not ignorant of the true facts. Also the CO had no actual or constructive knowledge. The Board properly denied HTC's estoppel claim.
 
 Equitable relief
 
 21
 HTC contends that the Government waived the Limitation of Cost Clause by continuing to ask for work with knowledge of contract overruns. Flight Dynamics Research Corp., ASBCA Nos. 35248, 35755, 88-3 B.C.A. (CCH) p 20,861 at 105,499-500 (1988). Again, the Board found that the CO had no actual or constructive knowledge of continued performance induced by Government representatives. The CO was the only person authorized to change or expand HTC's contract. The Board correctly declined to reimburse HTC's costs as overrun expenses based upon Mr. Levy's encouragement. HTC always had the option of refusing to perform further without the CO's authorization as the contract envisioned.
 
 CONCLUSION
 
 22
 Substantial evidence supports the Board's decision. No officer with authority under the contract to bind the Government induced HTC to continue performance in the face of cost overruns.
 
 COSTS
 
 23
 Each party to bear its own costs.
 
 
 24
 PAULINE NEWMAN, Circuit Judge, dissenting.
 
 
 25
 HTC Industries, conducting a technological project by contract with the government, was led into doing additional work and incurring additional costs for the benefit of the government. The government not only solicited, but received, accepted, and used the additional work. I can not agree that the government has no responsibility to the contractor for this work.
 
 
 26
 * The designated Contracting Officer's Technical Representative was Mr. Milton Levy, a scientist employed by the Army Materials Testing Laboratory (AMTL). Dr. H.T. Couch was the principal official of HTC Industries. The contract was for the development of titanium diboride coating technology, an area in which Dr. Couch had prior experience.
 
 
 27
 At the inception of the contract the Contracting Officer, Ms. Tully, told Dr. Couch to deal with Mr. DeVita, a "contract specialist." Dr. Couch never again heard from Ms. Tully. When the potential cost overrun became apparent and Dr. Couch asked Mr. DeVita where to send the proposal for continued funding, Mr. DeVita responded that there was no Contracting Officer assigned to the HTC contract, and instructed Dr. Couch to send the proposal to Ms. Jackie Hart, another "contract specialist". Dr. Couch's written proposal for extension of the contract was sent to Ms. Hart, Mr. DeVita, and Mr. Levy. Dr. Couch was never advised of its status. However, Mr. Levy encouraged him to continue to work. There was no response to Dr. Couch's letters, from any Contracting Officer or anyone else, except Mr. Levy. The Board found as fact, and the government agrees, that
 
 
 28
 Mr. Levy encouraged Dr. Couch to believe Mr. Levy could find the money to continue the work.
 
 
 29
 Board op. at 10.
 
 
 30
 The panel majority states that Dr. Couch should not have believed Mr. Levy. I can not share the view that the government was blameless. Mr. Levy, in his role as the Contracting Officer's Technical Representative, continued to encourage Dr. Couch to work on the technological problems. Mr. Levy asked for, received, and tested, various titanium diboride coatings that were prepared by HTC after the contract was known to have overrun its cost. The written reports from HTC were not acknowledged by any other official. Throughout the entire contract period all authorizations that the contract stated must come from the Contracting Officer, including the critical movement from Task I to Task II, came only from Mr. Levy.
 
 
 31
 Another Contracting Officer, Ms. Gelaznik, was eventually appointed. She recognized that the contract funds were exhausted, requested an audit, and sent two written inquiries to Mr. Levy. These inquiries were never answered by Mr. Levy, as he admitted to the Board. Contracting Officer Gelaznik made no contact with the contractor, did not answer Dr. Couch's letters, or take any action that could have spared HTC the continuing expense that it was incurring at Mr. Levy's behest. Mr. Levy admitted to the Board that he never told Dr. Couch that his efforts to find funding were unsuccessful, stating that he told him only that no funds were available at a particular time, even as he encouraged Dr. Couch to make additional coating samples.
 
 
 32
 For the Contracting Officer's Technical Representative to obtain and use the contractor's work under the conditions that Mr. Levy eventually admitted to have existed was a violation of statute and regulation. See 31 U.S.C. Secs. 1341-42 (government employees prohibited from accepting voluntary services); FAR Sec. 32.704(c). It is presumed that government officials act lawfully. Dr. Couch was not required to assume otherwise. It was not unreasonable for him to believe Mr. Levy's representations for, as Dr. Couch points out, the government accepted HTC's products and continued to test them, as it had throughout the contract.
 
 
 33
 There were other violations by the government. The FAR requires the government to issue a written notice to the contractor when the limit of funding is approached. The Board found that:
 
 
 34
 The government does not dispute appellant's evidence that the contracting officer never sent appellant the written notice provided in FAR 32.704 [Limitation of Cost or Funds].
 
 
 35
 Board op. at 11. Instead of this required warning, meetings were held to discuss technological progress, Mr. Levy's assistant Dr. Bhansali visited the HTC research facility in Connecticut, additional samples were requested, the government tested the samples, and Mr. Levy and his staff issued reports and publications containing the results. Although undoubtedly Dr. Couch had a commercial interest in continuing the work, that does not excuse the improper administration of this contract to the contractor's detriment.
 
 
 36
 Fairness as well as precedent require that the government accept reasonable responsibility for the consequences of this serious lapse in contract administration. This is not a scene of first impression. Recon Systems, Inc., 79-2 BCA p 14,058 (1979), aff'd on reconsideration, 80-1 BCA p 14,245 (1980), dealt with the situation wherein the Contracting Officer received notice of an overrun and took no action while a project officer expanded the work. The Contracting Officer
 
 
 37
 failed to make a timely determination of the availability of funds and to advise [the contractor] accordingly, but rather allowed the final tasks under the contract to be sent to the contractor and the Government to accept and use the end product.
 
 
 38
 80-1 BCA at 70,180. The Board imputed knowledge of the project officer's actions to the Contracting Officer because the Contracting Officer had been notified of the expected cost overrun and did not act on this imputed knowledge. The Board held that the government was bound by this failure to act. 79-2 BCA at 69,095-96. Similarly in Flight Dynamics Research Corp., ASBCA Nos. 14523 & 15163, 88-3 BCA p 20,861 at 105,499-500 (1988), the Board held that when the government asked for and received the benefit of a contractor's work when it knew the contract had overrun, the government should pay for the benefit despite a Limitation of Cost clause. See also Clevite Ordinance, 1962 BCA p 3330 at 17,153-55 (1962).
 
 
 39
 In Gould, Inc. v. United States, 935 F.2d 1271, 1275 (Fed.Cir.1991), this court held that if the government received a benefit under an illegal contract, equitable relief may be granted to the contractor. This obligation flows from the government's implied duty of good faith and fair dealing, see Malone v. United States, 849 F.2d 1441 (Fed.Cir.), modified, 857 F.2d 787 (Fed.Cir.1988); United States v. Amdahl Corp., 786 F.2d 387, 393 (Fed.Cir.1986), and the obligation to pay for benefits received, see Prestex, Inc. v. United States, 320 F.2d 367, 373 (Ct.Cl.1963) ("No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized or unenforceable for some other reason").
 
 
 40
 The Board found that the role of the Contracting Officer in the HTC contract "was barely visible," and that:
 
 
 41
 The evidence indicates that the AMTL Contracts Division did not closely monitor this contract and that the AMTL technical people did not coordinate their actions with the contracting officer.
 
 
 42
 Board op. at 11. As the Board stated in Recon, "[t]he contractor does not have the duty to coordinate the various Government offices involved in different aspects of monitoring contract performance." 79-2 BCA at 69,095.
 
 
 43
 The action of HTC in continuing to prepare and submit titanium diboride coating samples was reasonable under the circumstances of this case. I must dissent from the denial of all recompense.
 
 B
 
 44
 It is as important that the government deal fairly with contractors, as it is that contractors deal fairly with the government. See Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 387 (Jackson, J., dissenting) ("It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street"); Beta Systems, Inc. v. United States, 838 F.2d 1179, 1185-86 (Fed.Cir.1989); FAR Sec. 1.602-2(b) (contracting officers shall "[e]nsure that contractors receive impartial, fair, and equitable treatment").
 
 
 45
 Thus the conduct during the termination proceedings requires comment. For example, the contract incorporated FAR Sec. 52,232-20(h) requiring the government to reach an equitable distribution of the property upon completion of the work. On this issue the Board found:
 
 
 46
 [A]ppellant's attorney attempted to obtain the electro-deposition facility for appellant's use. Appellant had hopes of entering into a contract with the University of Connecticut with the aid of a $100,000 grant from the State of Connecticut. In late October 1988, the TCO advised appellant that the electrodeposition facil-ity could not be used.... Dr. Couch then withdrew from the University of Connecticut project and advised the TCO that he no longer had any interest in acquiring the facility.... In early January 1989, the TCO advised appellant the government was willing to make the facility available to the University of Connecticut to do further research.
 
 
 47
 Board Op. at 13. The government does not now defend this arbitrary behavior.
 
 
 48
 HTC made serious allegations relating to, for example: positions taken by certain witnesses before the Contracting Officer and later admitted before the Board to be incorrect; the withdrawal of the settlement offer without advising the contractor; the backdated affidavit; the false statements that were corrected only after discovery by HTC of contrary government documents. The government does not dispute the correctness of these charges, even the mildest view of which transcends merely arbitrary behavior. The Board found:
 
 
 49
 With respect to [HTC's] allegations of ... falsification of evidence, and loss, suppression, or destruction of evidence the Government concedes these allegations could have relevance to the contractual dispute. Its initial contention that these allegations should be dismissed for lack of specificity seems to have been abandoned in its post hearing brief.
 
 
 50
 Board Op. at 18. The Board stated that these allegations were considered to the extent that they "relate to the credibility of the evidence." Id. I deem this response inadequate to the seriousness of these occurrences.
 
 
 51
 On the undisputed findings that the Contracting Officer's Technical Representative encouraged the additional work, and received and used the benefits thereof, fair payment to the contractor is required. See Amdahl, 786 F.2d at 393 (Where a benefit has been conferred by the contractor on the government ... a contractor may recover at least ... the value of the conforming goods or services...."). Thus I respectfully dissent from the decision to affirm the Board's ruling.