# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of --       )
                       )
SIA Construction, Inc.       )    ASBCA No. 57693
                       )
Under Contract No. NNJ-05-JH68B   )

APPEARANCE FOR THE APPELLANT:       Brock C. Akers, Esq.
                                        Phillips, Akers, Womac
                                        Houston, TX

APPEARANCES FOR THE GOVERNMENT:    Scott W. Barber, Esq.
                                        NASA Chief Trial Attorney
                                        Alexander T. Bakos, Esq.
                                        Trial Attorney
                                        Michael L. Pratt, Esq.
                                        Attorney-Advisor
                                        Johnson Space Center, TX

## OPINION BY ADMINISTRATIVE JUDGE WILSON ON GOVERNMENT'S MOTION TO DISMISS FOR LACK OF JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

This appeal arises from a contracting officer's decision denying appellant's claim for damages resulting from the government's alleged failure to provide it a fair opportunity to be considered for delivery orders and an alleged breach of the duty of good faith and fair dealing under a multiple award contract for roofing construction. The government moves to dismiss on the grounds that the Board lacks jurisdiction to consider this appeal under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, because appellant's theory of recovery is based on the fraudulent activities of two government employees involved in the delivery order award process. The government further argues in the alternative that because the government cannot be held liable for the actions of its employees acting beyond the scope of their authority and without its knowledge, it is also entitled to summary judgment. In response to the government's motion, appellant focused on allegations regarding the conduct of the contracting officer in arguing that the government breached its duty of good faith and fair dealing. In reply, the government characterizes those allegations as different and unrelated operative facts from those relied upon in the claim and thus are not properly before the Board. It is unnecessary for us to resolve this issue to decide these motions. The government's motions are denied.

## STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

### The Request for Proposal

1. On 6 April 2005, the National Aeronautics and Space Administration (NASA or the government) issued request for proposal (RFP) No. NJ05096224R, which contemplated the award of multiple indefinite delivery/indefinite quantity (IDIQ) delivery order (DO) contracts for roofing repairs and rehabilitation at NASA's Johnson Space Center in Houston, Texas (R4, tab 35).

2. The RFP provided for the issuance of fixed-price, roofing construction delivery orders over a five-year period of performance. Contract awardees would compete with each other for delivery orders. The guaranteed minimum that could be ordered under a resulting contract was $10,000. The cumulative ordering ceiling, calculated across all of the IDIQ contracts awarded, could not exceed $9.9 million. (R4, tab 35 at 5, 6)

3. The RFP stated that the government would evaluate the proposals for the first delivery order, NNJ-05-JH69D (DO 1), based on the evaluation criteria listed in the contract solicitation. The government would also award DO 1 concurrently with award of the IDIQ contracts. (R4, tab 35 at 1)

4. The evaluation criteria for the IDIQ contracts, as well as for DO 1, were set out in Section LII, "BEST VALUE INSTRUCTIONS," and Section M, "EVALUATION FACTORS FOR AWARD" (R4, tab 35 at LII-1-8, M-1).

5. Section LII provided that the government would award the contracts and DO 1 using "NASA's Best Value Selection Procedures (see [FAR] Subpart 15.1 Source Selection Process and Techniques)":

> [NASA's Best Value Selection Procedure] is based on the premise that, if all offers are of approximately equal qualitative merit, award will be made to the offeror with the lowest evaluated price. The Government may award to an offeror with higher qualitative merit if the difference in price is commensurate with added value. Conversely, the Government may award to an offeror whose offer has lower qualitative merit if the price differential between it and other offers warrant doing so.... [T]he Government may award the contracts to the offeror providing the best overall value.

(R4, tab 35 at LII-1)

2

6. Section M specified that the government would follow a two-step evaluation process in which the government would initially evaluate each proposal to determine its acceptability, then evaluate all acceptable offers against the specifications/statement of work and the value characteristics listed at Section LII (R4, tab 35 at M-1).

7. According to Section M, price was defined as "that information encompassed by paragraph **6.2** ([s]ee page LII-2)." The government would "consider each offeror's proposed price elements in evaluating the offeror's understanding of the effort required, and to establish what additional value, if any, is associated with a higher price, or what factors contribute to a lower price...as part of the best value selection process." The evaluation factors were assigned the following relative importance: "Technical Acceptability and Past Performance, when combined, are approximately equal to cost or price. Technical Acceptability is more important than Past Performance." (R4, tab 35 at M-1)

Contract Award

8. Effective 15 July 2005, NASA entered into Contract No. NNJ-05-JH68B (the SIA contract), with SIA Construction, Inc. (SIA or appellant) (R4, tab 31A).

9. NASA entered into similar IDIQ contracts with American Plastics, Inc. (API), and Crown Roofing Services, Inc. (Crown). API was awarded Contract No. NNJ-05-JH67B and Crown was awarded Contract No. NNJ-05-JH66B (the Crown contract).[1] (R4, tab 30 at 5)

10. The SIA contract incorporated by reference FAR 52.233-1, DISPUTES (JUL 2002) – ALTERNATE I (DEC 1991) (R4, tab 31A at I-3).

11. The SIA contract incorporated by reference FAR 52.216-18, ORDERING (OCT 1995). The Ordering clause provided that any services furnished under the contract would be ordered by the issuance of delivery orders and that:

> (b) All delivery orders...are subject to the terms and conditions of this contract. In the event of a conflict between a delivery order...and this contract, the contract shall control.

(R4, tab 31A at I-1)

---

[1] Neither of these IDIQ contracts presently appears in the record.

12. Clause B.4 of the SIA contract, "LIMITED COMPETITION AMONG DELIVERY ORDERS," outlined the following limited competition procedures for the issuance of delivery orders:

> a. This contract is one of a group of multiple award contracts. The procedure for administering orders under multiple award contracts is detailed in the Federal Acquisition Regulation (FAR) at [paragraph] 16.505(b). It is the Government's intention to compete Delivery Orders among the IDIQ Contractors to the maximum extent practicable. In placing orders[,] the *Contracting Officer* may consider past performance, quality of workmanship, and price, to provide each IDIQ Contractor a fair opportunity to be considered for each order....

> b. Timely offers received will be evaluated taking into consideration, as a minimum, performance on previous and current delivery orders and proposed price.

(R4, tab 31A at B-2) (Emphasis added)

13. The procedures detailed at FAR 16.505(b), incorporated into the SIA contract by Clause B.4, required contracting officers to provide contractors with a fair opportunity to compete for delivery orders:

> (i) The *contracting officer must provide each awardee a fair opportunity to be considered* for each order exceeding $2,500 issued under multiple delivery-order contracts...except as provided for in paragraph (b)(2) of this section.

FAR 16.505(b)(1) (Emphasis added). Contracting officers were given broad discretion to develop and implement a process for placing orders, provided that it afforded each awardee a fair opportunity to be considered for each order:

> (ii) The contracting officer may exercise broad discretion in developing appropriate order placement procedures. The contracting officer should keep submission requirements to a minimum. Contracting officers may use streamlined procedures, including oral presentations. In addition, the contracting officer need not contact each of the multiple awardees under the contract before selecting an awardee if the contracting officer has information available to ensure that each awardee is provided a fair opportunity to be considered for each order. The competition requirements in [FAR] part 6

4

and the policies in [FAR] subpart 15.3 do not apply to the ordering process....

FAR 16.505(b)(1).

14. Clause C.1 of the SIA contract, Statement of Work, specified:

All work shall be initiated through Delivery Orders issued in accordance with JSC Clause 52.216-95 Method for Placing Delivery Orders. *Delivery Orders may be issued only by the Contracting Officer.* [Italics added]

(R4, tab 31A at C-1)

15. In all, ten delivery orders were issued under the three IDIQ contracts: NNJ-05-JH69D (DO 1), NNJ-05-JJ84D (DO 2), NNJ-06-JA41D (DO 3), NNJ-06-JE39D (DO 4), NNJ-06-JE40D (DO 5), NNJ-06-JE38D (DO 6), NNJ-06-JG02D (DO 7), NNJ-06-JG03D (DO 8), NNJ-06-JG01D (DO 9), and NNJ-06-JI37D (DO 10) (R4, tabs 26, 38, 50, 57, 64, 71, 79, 91, 101, 113). Of these, eight delivery orders were awarded to Crown: DOs 1, 2, 4, 5, 7, 8, 9, and 10 (R4, tabs 26, 38, 57, 64, 79, 91, 101, 113). Two delivery orders were awarded to SIA: DOs 3 and 6 (R4, tabs 50, 71). None were awarded to API.

16. Several contracting officers were involved in the award and management of the IDIQ contracts and their appurtenant delivery orders (app. resp. at 8-9; R4, tabs 26, 29, 31A, 38, 42, 50, 51, 57, 59, 64, 71, 79, 82, 91, 93, 101, 104, 113, 116). Contracting officer Carrie L. Mulholland awarded the IDIQ contracts to SIA, API, and Crown (R4, tabs 30, 31A) and also issued the first delivery order (R4, tab 26). Contracting officers Robert L. Derr and Karen D. Adams each issued numerous delivery orders. Mr. Derr was the issuing contracting officer for DOs 2, 3, 4, 5, and 6 (R4, tabs 38, 50, 57, 64, 71), while Ms. Adams issued DOs 7, 8, 9, and 10 (R4, tabs 79, 91, 101, 113).

17. To assist the contracting officers with managing the IDIQ contracts and the delivery orders, several contracting officer's technical representatives (COTRs) were appointed to perform certain technical and administrative functions as designated in their delegation letters. Among those appointed COTRs were Messrs. Larry Shelmire and Jameel Hattab (R4, tabs 29, 81). Mr. Shelmire was one of two COTRs appointed to assist in the management of DO 1 (R4, tab 29). Mr. Hattab was appointed COTR to help manage DO 7 (R4, tab 81). Other individuals were appointed COTRs for DOs 1, 2, 9, and 10 (R4, tabs 29, 41, 103, 115). The record does not include COTR delegation letters for DOs 3, 4, 5, 6, and 8.

18. In addition to their delegated contract management duties, some of the COTRs also served as technical evaluators for the issuance of delivery orders (R4,

5

tabs 30, 45, 52, 59, 66, 73, 83, 94, 105, 117). Mr. Shelmire was a technical evaluator for the IDIQ contract competition (R4, tab 30), as well as for DOs 1, 4, 5, and 6 (R4, tabs 30, 59, 66, 73). Mr. Hattab was a technical evaluator for DOs 7 and 8 (R4, tabs 83, 94). Other individuals were technical evaluators for DOs 2, 3, 9, and 10 (R4, tabs 45, 52, 105, 117). The "Technical Evaluation" for each delivery order also included an analysis of the awardees' proposed prices, in addition to an evaluation of the technical aspects of their proposals, and each technical evaluator concluded his evaluation by recommending award to a particular contractor (R4, tabs 30, 45, 52, 59, 66, 73, 83, 94, 105, 117).

19. The record includes "SOURCE SELECTION STATEMENT[S]" for many, but not all, of the delivery orders. The source selection statements identify "Source Selection Official[s]" and explain their "Best Value" rationale for issuing delivery orders to particular contractors (R4, tabs 30, 42, 51, 82, 93, 104, 116). The record does not include source selection statements for DOs 4, 5, and 6 (R4, tabs 59, 66, 73).

20. Upon selecting a contractor for award of each delivery order, Mr. Derr sent the unselected contractors a letter informing them that they had not been selected and why not. Mr. Derr also identified which contractor had been selected and stated that award of the delivery order had been made "[i]n accordance with [NASA FAR Supplement (NFS)] 1871.604-4, Selection of 'Best Value' offer." (R4, tabs 28, 40, 58, 65, 72, 80, 92, 102, 114)[2]

21. On 23 May 2006, the NASA Inspector General began an investigation into alleged improprieties, including possible criminal conduct, involving the Crown contract (R4, tab 2).

22. By letter to Crown dated 19 July 2007, contracting officer Ms. Mulholland suspended all performance on its IDIQ contract, including all work under its current delivery orders, pursuant to FAR 52.242-14, SUSPENSION OF WORK (APR 1984) (R4, tab 11).

23. On 30 July 2007, NASA terminated the Crown contract for default (R4, tab 12). Appellant was selected to complete work on DO 4 (compl. at 20, answer ¶ 58).[3]

24. Mr. Hattab pleaded guilty to violating 18 U.S.C. §§ 208(a) and 216(a)(2), committing acts affecting a personal financial interest, on 17 December 2007 (R4, tab 9).

---

[2] On 2 September 2004, prior to the issuance of the solicitation for the IDIQ contract, Part 1871 of the NFS, "MidRange Procurement Procedures," was entirely removed from the NFS because it was deemed unnecessary given the best value procedures "directly traceable to FAR Parts 12, 14, and 15." Removal of MidRange Procurement Procedures, 69 Fed. Reg. 53,652-01 (Sep. 2, 2004).

[3] The record does not include any information indicating why appellant, rather than API, was selected to complete DO 4 following the termination of the Crown contract.

Mr. Shelmire pleaded guilty to violating 18 U.S.C. §§ 208(a) and 216(a)(2) on 5 May 2008 (R4, tab 10).

25. By letter dated 18 November 2010, appellant submitted a certified claim demanding $484,327 for bid and proposal costs and anticipated profits to which it asserted entitlement due to alleged breaches of the *"Fair opportunity"* clause of the SIA contract, duties owed to appellant under FAR 16.505(b)(1) and 41 U.S.C. § 253, and the government's duty of good faith and fair dealing (R4, tab 1). Appellant alleged "[s]pecific examples of NASA's breach and bad acts under this claim," which included *inter alia*, unspecific allegations of bid rigging and other acts due to an "obvious [conflict of interest]" (*id.* at 5-6). Appellant further alleged:

> NASA Contracting Officer over the IDIQ Roofing Contract either had direct knowledge / participation of [sic] the intentional manipulation of the procurement process, or, as the warranted responsible person over the IDIQ contract competition and administration, at least ratified the bad acts by other NASA personnel.

(R4, tab 1 at 6) Additionally, appellant alleged "unfair and unjust treatment" to it in the issuance of delivery orders (*id.* at 7), and "NASA COTR[s] intentionally delayed the project start date of the two delivery orders that were awarded to [appellant] so that [its] bid bond capacity would be effected [sic] on DO[s] 7, 8 and 9" (*id.* at 12).

26. On 10 December 2010, the government filed a complaint as an intervener in the U.S. District Court for the Southern District of Texas against, *inter alia*, Crown and Mr. Hattab, citing numerous violations including, *inter alia*: (1) false claims; (2) kickbacks; (3) bribes; and (4) breach of fiduciary duties with regard to Mr. Shelmire, Mr. Hattab, and Crown (R4, tab 21 at 8).

27. By letter dated 14 January 2011, the contracting officer informed appellant that she would be unable to render a final decision without additional information regarding several points raised in appellant's 18 November 2010 letter. The contracting officer's letter requested appellant to provide answers, with supporting documentation, to several questions, including the identities of the unidentified NASA personnel, the capacity in which these personnel manipulated the procurement process, and whether appellant had evidence of intentional delays. (R4, tab 17)

28. Appellant responded to the contracting officer's request for additional information by letter dated 21 February 2011 (R4, tab 19 at 1). Appellant stated in its response that "**other NASA personnel may have been involved (in addition to [the COTRs]), including the possibility of the NASA Contract[ing] Officer at the relevant time, Robert Derr**" (*id.* at 2). Appellant also provided some examples of delays which it alleged were intentional, including the following: award of the contract;

7

issuance of the notice to proceed; providing site access to the construction work area; approval of submittals; and security badging due to unreasonable policy change (*id.* at 11).

29. By letter dated 15 March 2011, the contracting officer again informed appellant that she required additional documentation supporting appellant's allegations before she could render a decision on appellant's claim (R4, tab 20). Appellant responded by email dated 4 April 2011, the attachments to which included the United States' 10 December 2010 complaint as intervenor in the *qui tam* action against Crown and Mr. Hattab (R4, tab 21).

30. The contracting officer issued her final decision by letter dated 25 April 2011, denying appellant's claim in its entirety (R4, tab 23). In her final decision, the contracting officer stated:

> [Y]ou rely, in large part, on the criminal convictions of Mssrs. [sic] Hattab and Shelmire to illustrate that NASA breached the "fair opportunity" clause....
>
> ....
>
> While [appellant] did win two delivery orders under this contract totaling over $370,000, you have claimed breach of the fair opportunity clause of the contract. Your allegations of serious misconduct on the part of NASA officials, which if proven and imputed to NASA, could potentially, serve as the basis of a breach of the fair opportunity clause.

(R4, tab 23 at 2-3) Additionally, the contracting officer identified that appellant was, "with the exception of the task orders for Building 16 and Building 420":

- Not the low bidder;
- Could not bond for a project;
- The NASA COTR had no conflict of interest; and/or
- The construction job was never turned on.

(R4, tab 23 at 2) By letter dated 20 July 2011, appellant timely filed its notice of appeal with the Board (R4, tab 24).

8

# DECISION

## A. *The Government's Motion to Dismiss for Lack of Jurisdiction*

The government moves to dismiss this appeal for lack of jurisdiction, asserting that fraudulent acts permeate the issues of this appeal and that the Board lacks jurisdiction over claims where the CDA prohibits the contracting officer from settling, compromising, or otherwise adjusting any claim involving fraud (gov't mot. at 8). Specifically, the government argues that the Board lacks jurisdiction because the "fraudulent" conduct of Messrs. Shelmire and Hattab is an inextricable part of appellant's claims (*id.* at 12-13). The government relies on the language of 41 U.S.C. § 7103(c)(1) (formerly codified 41 U.S.C. § 605(a)) as the basis for its argument that the CDA precludes the Board's jurisdiction where the contracting officer may not "settle, compromise, pay, or otherwise adjust any claim involving fraud." To support this position, the government points to a decision from the Corps of Engineers Board of Contract Appeals, *Beech Gap, Inc.*, ENG BCA Nos. 5585, 5600, 95-2 BCA ¶ 27,879. The government additionally notes that the Board does not have jurisdiction over criminal or civil fraud or claims of tortious conspiracy, citing *Environmental Safety Consultants, Inc.*, ASBCA No. 47498, 00-1 BCA ¶ 30,826 at 152,146-47.

The government is correct that "[t]he Board does not have jurisdiction over criminal or civil fraud and would not have jurisdiction over a claim of fraud." *Environmental Safety Consultants, Inc.*, ASBCA No. 53485, 02-2 BCA ¶ 31,904 at 157,613 (citing *Janice Cox d/b/a Occupro Limited*, ASBCA No. 50587, 01-1 BCA ¶ 31,377, *recon. denied*, 01-2 BCA ¶ 31,619). However, the existence of fraud alone is insufficient to deprive the Board of jurisdiction. As we noted recently in *Public Warehousing Company K.S.C.*, ASBCA No. 58078, 13 BCA ¶ 35,460 at 173,896:

> The Board does have jurisdiction under the CDA to decide the contract rights of the parties even when fraud has been alleged. For example, the Board has jurisdiction to decide the amount of a contractor's quantum recovery. *Environmental Safety Consultants*, 02-2 BCA ¶ 31,904 at 157,613 ("That fraud allegedly may have been practiced in the preparation and submission of claims does not deprive the Board of jurisdiction under the CDA."); *Nexus Construction Co.*, ASBCA No. 51004, 98-1 BCA ¶ 29,375 (Board has jurisdiction to decide contractor's entitlement under the termination for convenience clause when CO's decision denied the contractor's termination claim as tainted by fraud.). In *Toombs & Co.*, 89-3 BCA ¶ 21,993 at 110,598, we said "In determining the contractual rights of the parties, it is sufficient for the Board to determine whether statements made in claims are correct or incorrect. The Board need not,

9

and does not, determine whether those statements which it finds incorrect were made knowingly with intent to deceive."

We find *Public Warehousing Company* controlling where, as here, criminal conduct has already been established by pleas and convictions yet where other issues of contract interpretation still remain for the Board's consideration. The fraudulent activity has already been determined by the pleas and convictions of the COTRs, Messrs. Shelmire and Hattab, for violations of 18 U.S.C. §§ 208(a) and 216(a)(2) (SOF ¶ 24). On the record presently before us, however, we cannot find the "fraud" to be so inextricably intertwined with appellant's claims as to leave the Board with nothing left to decide. Only contracting officers could issue delivery orders under the contracts (SOF ¶ 14). The contracting officers, not the COTRs, had the duty to afford appellant a fair opportunity (SOF ¶¶ 12-13). *See* FAR 16.505(b); 10 U.S.C. § 2304c(b) ("[A]ll contractors awarded [a multiple award delivery order contract] shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each...delivery order in excess of $2,500."). Determining whether appellant was afforded a fair opportunity to be considered for delivery orders, and whether the government breached its duty of good faith and fair dealing, would require us to expand the scope of our inquiry beyond the conduct of the COTRs in order to examine the conduct of the various contracting officers involved in issuing and managing delivery orders under the contract.

In its claim and in its complaint, appellant cites a list of "Specific examples of NASA's breach and bad acts," including unspecific allegations of bid rigging, kickbacks, unauthorized disclosure of confidential business information, and other allegations the consideration of which would require the Board to determine fraud (SOF ¶ 25; compl. at 11-12). We have neither the jurisdiction nor the need to consider such allegations. As we discussed above, criminal violations of 18 U.S.C. §§ 208(a) and 216(a)(2) have already been established by pleas and convictions, and we will not retry the issue. Nothing in the record presently before us compels a conclusion that determining whether several NASA contracting officers afforded appellant a fair opportunity or the government breached a duty of good faith and fair dealing would require us to make a determination of fraud.

The "fraud" involved in this appeal was perpetrated by government employees, not by appellant. It has not been alleged, nor does the present record indicate, that appellant participated in any fraudulent conduct or that its claim contains any fraudulent misrepresentation of fact, and we have found no case instructive on the applicability of 41 U.S.C. § 7103(c), "FRAUDULENT CLAIMS," to contractor claims that are not alleged to be fraudulent. It is peculiar for the government to point to a statutory prohibition against "settlement, compromise, payment, or other adjustment of claims involving fraud" to bar the Board's jurisdiction over a claim which no one alleges contains any misrepresentations of fact. *See* 41 U.S.C. § 7103(c). Such an interpretation stands in contrast to the purpose behind the original statutory language: to exclude from

10

contracting officers' consideration only "issues of fraud against the United States," while "other parts of the claim not associated with possible fraud or misrepresentation of fact will continue on in the agency board...where the claim originated." S. Rep. No. 95-1118, at *20 (1978). Furthermore, as we noted recently in *International Oil Trading Company*, ASBCA No. 57491 *et al.*, 13 BCA ¶ 35,393 at 173,658, it is not clear that 41 U.S.C. § 7103(c) precludes the Board's jurisdiction where, as here, the contracting officer denied a claim entirely, rather than "settle[d], compromise[d], [paid], or otherwise adjust[ed]...the claim":

> The Board is not an "agency head," as defined by the CDA. Moreover, since the enactment of the CDA, the Board's authority to decide appeals is statutory and not derived by a delegation of authority from an agency head.

(Citations omitted)

It is well settled that the Board has jurisdiction to interpret the contract and inquire into whether the government failed to provide appellant a fair opportunity to compete for delivery orders and whether it breached its duty of good faith and fair dealing, insofar as we are able to do so without having to determine fraud. *See Public Warehousing Company*, 13 BCA ¶ 35,460 at 173,896-97; *Environmental Safety Consultants*, 02-2 BCA ¶ 31,904 at 157,613; *Toombs & Co.*, ASBCA Nos. 35085, 35086, 89-3 BCA ¶ 21,993 at 110,598; *Community Consulting International*, ASBCA No. 53489, 02-2 BCA ¶ 31,940; *Free & Ben, Inc.*, ASBCA No. 56129, 09-1 BCA ¶ 34,127. Accordingly, the government's motion to dismiss for lack of jurisdiction is denied.

## B. *The Government's Motion for Summary Judgment*

The government has moved in the alternative for summary judgment on the issues of whether appellant was deprived of a fair opportunity to be considered for delivery orders and whether the government breached its duty of good faith and fair dealing. On the fair opportunity issue, the government argues that it is entitled to summary judgment because appellant's claim is entirely premised on the criminal conflicts of interest of Messrs. Shelmire and Hattab and NASA cannot be held liable for their criminal acts (gov't mot. at 15, 30-31). As to the issue of breach of the duty of good faith and fair dealing, the government argues that summary judgment is appropriate because appellant has not established "bad faith" by clear and convincing evidence (*id.* at 14-15, 26-28).

### 1. Standard of Review.

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987). The party seeking summary judgment has the burden of

11

demonstrating both elements. *Dongbuk R&U Engineering Co.*, ASBCA No. 58300, 13 BCA ¶ 35,389 at 173,637. We do not resolve factual disputes, but determine whether there is a genuine issue of material fact. *BYA International, LLC*, ASBCA No. 57608, 13 BCA ¶ 35,196 at 172,696. A material fact is one which may affect the outcome of the case, and there is genuine issue of fact if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must show that there is no such issue, while the nonmovant must counter with facts showing that there is one. *Kaman Precision Products, Inc.*, ASBCA Nos. 56305, 56313, 10-2 BCA ¶ 34,529 at 170,285. We draw all justifiable inferences in favor of the nonmoving party. *CI², Inc.*, ASBCA Nos. 56257, 56337, 11-2 BCA ¶ 34,823 at 171,353.

### 2. Determining whether appellant was afforded a fair opportunity raises factual issues that cannot be resolved by summary judgment.

We have already found that appellant's fair opportunity claim was not "entirely premised" on the criminal actions of the COTRs (SOF ¶ 30). Determining whether appellant was afforded a fair opportunity to be considered for delivery orders would require us to examine the conduct of the contracting officers who were responsible for issuing and administrating the delivery orders (SOF ¶¶ 12-14).

We have held consistently that whether the government afforded an awardee a fair opportunity to be considered for task or delivery orders is an issue that is not appropriate for summary judgment. *See Community Consulting International*, 02-2 BCA ¶ 31,940. "Whether the contracting officer fairly considered appellant for orders in accordance with the terms of the contract raises factual issues that cannot be resolved by summary judgment." *Id.* at 157,790 (citing *Burke Court Reporting Co.*, DOTCAB No. 3058, 97-2 BCA ¶ 29,323 at 145,801). The government's alternative motion for summary judgment with respect to appellant's fair opportunity claim is denied.

### 3. The incompleteness of the record before us precludes summary judgment as to whether NASA breached its duty of good faith and fair dealing.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Construction Company v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS, § 205 (1981)). Whether the government breached the duty of good faith and fair dealing requires consideration under the standards reflected in *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005), and *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988). *Metcalf*, 742 F.3d at 994. The duty of good faith and fair dealing imposes obligations on both contracting parties, including the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party. *Centex*, 395 F.3d at 1304. Government agents are presumed to discharge their duties in good faith, and a party alleging "bad faith" or "bad intent" can

overcome this presumption only by clear and convincing evidence. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *Versar, Inc.*, ASBCA No. 56857 *et al.*, 12-1 BCA ¶ 35,025 at 172,127. However, a showing of "bad faith" or "bad intent" is not necessary to demonstrate a breach of the duty of good faith and fair dealing, which applies to the government just as it does to private parties. *See Centex*, 395 F.3d at 1304; RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a (1981). A breach of the duty of good faith and fair dealing may be shown by proving, *inter alia*, a lack of diligence, willful or negligent interference, or a failure to cooperate. *Malone*, 849 F.2d at 1445.

When the government is accused of breaching the duty of good faith and fair dealing, we examine the reasonableness of its actions, considering all of the circumstances. *Free & Ben*, 09-1 BCA ¶ 34,127 at 168,742. Issues requiring the determination of the reasonableness of the acts of the parties under all the facts and circumstances of the case cannot ordinarily be disposed by summary judgment. *Coastal Government Services, Inc.*, ASBCA No. 50283, 99-1 BCA ¶ 30,348 at 150,088; *see also BYA International*, 13 BCA ¶ 35,196 at 172,696 (what constitutes a reasonable forebearance period prior to default is fact dependent and not ordinarily disposed by summary judgment).

The record presently before us is not so complete that we can find, without further development of the record, that the government's actions were reasonable considering all of the circumstances. Without Crown's IDIQ contract in the record (SOF ¶ 9), we cannot say whether its terms differ materially from the terms of appellant's IDIQ contract or whether any such differences, if left uncorrected by the government, might deprive appellant of its expectations under the contract. Furthermore, the reasonableness of the government's conduct in making its "best value" determinations for issuing delivery orders – including those competitions in which neither Mr. Shelmire nor Mr. Hattab was a technical evaluator – is highly fact dependent, and the record presently before us is unclear.

For instance, it appears from the record that in addition to evaluating the technical aspects of delivery order proposals, technical evaluators evaluated the proposed prices and compared them to the government's estimate before making a recommendation for award (SOF ¶ 18). This is particularly problematic when the record lacks source selection statements showing that the contracting officer independently arrived at "Best Value" determinations for DOs 4, 5, and 6 (SOF ¶ 19), the technical evaluator for which was the criminally-conflicted Mr. Shelmire (SOF ¶ 18).

To resolve these disputed facts and issues, we believe that the appeal record needs further development. *See Cooley Constructors, Inc.*, ASBCA No. 57404, 11-2 BCA ¶ 34,855 at 171,457. Therefore, the government's alternative motion for summary judgment with respect to appellant's claim for breach of the duty of good faith and fair dealing is denied.

**4. The incompleteness of the record before us precludes summary judgment as to whether NASA contracting officials acted in bad faith.**

In alleging bad faith by the government, appellant must carry a high burden to overcome the government's presumption of having acted in good faith. *Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012). To carry this "high burden," requires a showing by clear and convincing evidence that a contracting officer acted with the specific intent to injure appellant. *Am-Pro*, 281 F.3d at 1239-40.

As the government noted in its motion for summary judgment, the convictions of Messrs. Shelmire and Hattab "establish beyond a reasonable doubt that they had criminal conflicts of interest" (gov't mot. at 28). The criminal convictions on record are sufficient to rebut the presumption of good faith, but only with regard to these two individuals in their capacities as COTRs and technical evaluators. We must still presume that the contracting officers acted in good faith. To overcome the presumption of good faith, appellant must do more than merely allude to bad faith by contracting officials (SOF ¶¶ 25, 28). Appellant must show by clear and convincing evidence that a contracting officer acted with the specific intent to injure appellant. *Am-Pro*, 281 F.3d at 1240. Given the incomplete record before us, we cannot say that additional discovery would not enable appellant to carry its burden. Accordingly, the government's alternative motion for summary judgment with respect to appellant's allegations of bad faith is denied.

## CONCLUSION

For the foregoing reasons, the government's motion to dismiss the appeal for lack of jurisdiction, and the government's alternative motion for summary judgment, is denied.

Dated: 17 September 2014

OWEN C. WILSON
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

14

I concur

MARK N. STEMPLER
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 57693, Appeal of SIA Construction, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

15