# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Military Aircraft Parts | )  ASBCA No. 60009 |
| | ) |
| Under Contract No. SPM4A7-11-M-D111 | ) |

APPEARANCE FOR THE APPELLANT:      Mr. Robert E. Marin
                                   President

APPEARANCES FOR THE GOVERNMENT:    Daniel K. Poling, Esq.
                                    DLA Chief Trial Attorney
                                   Edward R. Murray, Esq.
                                   Jason D. Morgan, Esq.
                                    Trial Attorneys
                                    DLA Aviation
                                    Richmond, VA

## OPINION BY ADMINISTRATIVE JUDGE O'SULLIVAN

Military Aircraft Parts (MAP) appeals from a contracting officer's final decision denying its claim for breach of contract. The parties have submitted the appeal for decision on the written record pursuant to Board Rule 11.[1] Both entitlement and quantum are at issue. We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. We sustain the appeal in part.

## FINDINGS OF FACT

1. Purchase Order No. SPM4A7-11-M-D111 (the contract) was issued by the Defense Logistics Agency Aviation (DLA Aviation) field office, Richmond, Virginia, to MAP on 18 November 2010 (R4 tab 1). The government sought to acquire one first article and six production units of a steel flap track liner for the A-10 aircraft (*id.* at 3, 8-10). The contract identifies this part as a Critical Application Item (*id.* at 4). The total price of the contract, for first article manufacture and testing and six production parts, was $7,550.00 (*id.* at 1). Section B of the contract contains first article testing instructions, which provide in pertinent part:

> 5. MATERIAL PROCESSING, INCLUDING FINISH
> REQUIREMENTS (PLATING, CASTING, FORGING,

---

[1] MAP originally elected to proceed under Board Rule 12.2, small claims expedited procedure. MAP subsequently elected to remove the appeal from the Board's Rule 12 docket in order to extend the time available for discovery.

HEAT TREATMENT, WELDING, INSPECTION, ANODIZE, PAINTING, ETC.) UTILIZED IN THE MANUFACTURE OF FIRST ARTICLE ITEMS SHALL BE IDENTIFIED AND CERTIFIED ALONG WITH A COPY OF MATERIAL PURCHASE REQUESTS AS CONFIRMING TO APPLICABLE DATA REQUIREMENTS. A COPY OF THE PURCHASE ORDER CERTIFYING THE PROCESS ACCOMPLISHED AT OTHER THAN CONTRACTOR FACILITY SHALL BE INCLUDED.

(*Id.* at 3) The applicable drawings specify the application of cadmium plating and epoxy-polyamide primer as part of the manufacturing process (R4, tab 19 at 7).

2. The contract contained the Federal Acquisition Regulation (FAR) 52.209-4, FIRST ARTICLE APPROVAL—GOVERNMENT TESTING (SEP 1989) clause, with its ALTERNATE I (JAN 1997). The clause provides in pertinent part:

> (b) Within 120 calendar days after the Government receives the first article, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article. The notice of conditional approval or approval shall not relieve the Contractor from complying with all requirements of the specifications and all other terms and conditions of this contract. A notice of conditional approval shall state any further action required of the Contractor. A notice of disapproval shall cite reasons for the disapproval.

> (c) If the first article is disapproved, the Contractor, upon Government request, shall submit an additional first article for testing. After each request, the Contractor shall make any necessary changes, modifications, or repairs to the first article or select another first article for testing. All costs related to these tests are to be borne by the Contractor, including any and all costs for additional tests following a disapproval. The Contractor shall furnish any additional first article to the Government under the terms and conditions and within the time specified by the Government....

> (d) If the Contractor fails to deliver any first article on time, or the Contracting Officer disapproves any first article, the Contractor shall be deemed to have failed to

2

make delivery within the meaning of the Default clause of this contract.

....

(h) Before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Before first article approval, the costs thereof shall not be allocable to this contract for (1) progress payments, or (2) termination settlements if the contract is terminated for the convenience of the Government.

(R4, tab 1 at 14)[2] The contract also contains a DLA clause with additional requirements, 52.209-9018, FIRST ARTICLE – GOVERNMENT TEST – ADDITIONAL REQUIREMENTS (SEP 2008) DLAD (*id.*).

3. The contract required delivery of the first article to the government for testing by 17 May 2011, 180 days after award (R4, tab 1 at 2). It is undisputed that MAP did not deliver the first article by this date; the first article was delivered to the government for testing on 30 January 2012 (R4, tab 37).[3] Government testing of MAP's first article resulted in a discrepancy report that was attached to a notice provided by the contracting officer to MAP on 15 May 2012 that its first article was disapproved (R4, tabs 4, 5). The only discrepancy noted after testing and inspection was with respect to the holes drilled in the part to facilitate its attachment to the flap track—the contract called for the holes to be .190" to .194" in diameter, but the report stated that the actual diameter was ".195 - .196 [in] twelve places" (*id.*).[4]

4. The government's structures engineer who replaced the engineer responsible for reviewing the first article submitted by MAP is familiar with the A-10 wing flap system and provided the following general information about the holes in the flap liner. Aircraft mechanics use the 12 holes to mount the liner, with fasteners, to an underlying aluminum section which is traversed by the roller that extends and retracts the wing flaps of the aircraft. If the liner were not securely fastened and were to detach from the mating section below, the roller would be likely to damage that section and potentially cause the wing flap not to operate correctly. In addition, if the

---

[2] FAR 52.209-4 is not set forth in full text in the contract document.

[3] The record before us does not indicate that the government took any action with respect to the missed delivery date. There is no indication that a new delivery date was ever established.

[4] A second discrepancy with respect to the certification package was corrected on 14 May 2012 (*id.*).

3

liner holes are too large, the mechanic attaching the liner may not be able to use it as a template for drilling holes in the mating part and may not be able to use the specified fasteners. (Gov't br., ex. A, Casey Thurber decl. (Thurber decl.) ¶¶ 1-4) However, the government has presented no evidence that the nonconforming holes in MAP's first article were large enough to actually present the potential problems described.

5. At MAP's request, quality assurance representatives (QARs) Randall Fritz and Greg Keeler from the Defense Contract Management Agency (DCMA) visited MAP's facility on 20 June 2012 to witness an inspection of the returned part (gov't br., ex. C, Randall Fritz decl. (Fritz decl.) ¶¶ 2, 3). Contrary to the discrepancy report, only 3 (out of 12 total) holes were found to be out of tolerance—i.e., measuring .195" to .196" in diameter (R4, tab 6). The remainder measured .190" to .194" in diameter (R4, tab 40). At the time, Mr. Marin of MAP pointed out that the out-of-tolerance holes were missing paint, and stated that this condition could have been caused by forcing gauge pins[5] through the holes, thereby removing the paint and enlarging the holes (Fritz decl. ¶ 5). Mr. Fritz responded that Mr. Marin's theory was plausible but unlikely, and offered him an opportunity to demonstrate on another part. Mr. Marin declined because he did not want to destroy a part. (*Id.*; R4, tab 9 at 1)

6. The same day, 20 June 2012, Mr. Marin emailed DLA contract administrator Lisa Hardy, noting that paint was missing from the holes that were measured to be out of tolerance, and further stating that MAP suspected that the part "was in tolerance and acceptable per drawing when submitted and forceful inspection at the ESA caused by forcing a gage pin thru the hole occurred."[6] Mr. Marin asserted that over a hundred holes in parts made at the same time were in tolerance and did not have paint removed from the holes. He requested permission to do a resubmittal at no cost. (R4, tab 6 at 1) QAR Fritz replied to this email, confirming to Ms. Hardy that three of the holes were out of tolerance, and stating "I would concur with you, if you should decide to allow a no cost resubmittal" (*id.*).

7. The ESA engineering technician who performed the measurement of the holes in the first article provided a declaration in which she confirmed that she "found the holes to be in the .195" to .196" range." She denied enlarging the holes or forcing gauge pins through the holes, but did state that it is possible that her use of the gauge pin could have removed paint from the holes. In her opinion, such a result would be "typical, but irrelevant to the inspection. The inspection is for the diameter of the metal, not the paint." (Gov't br., ex. B, Julie Morse decl. (Morse decl.) ¶¶ 1-4) Engineer Thurber backs up Ms. Morse's opinion in this regard, declaring that:

---

[5] The Board will refer to these measuring instruments as "gauge pins," following the dictionary preferred spelling of the word "gauge," but in the record the spelling used is most often "gage."

[6] ESA refers to the Engineering Support Activity at Hill Air Force Base, Utah. The ESA conducted the first article inspection at issue in this appeal.

It is...irrelevant that the paint was removed from any of the holes in the part. The inspection should be measuring the diameters of the metal, not paint. Paint is not a structural component and obviously does not have the structural integrity of steel. Paint will not hold a fastener in place. Likewise, a part with oversized holes cannot be repaired by adding paint to the holes. This will not repair the structural integrity of the part.

(Thurber decl. ¶ 5)

8. Although Ms. Morse does not in her declaration provide any details about how she conducted her inspection, there is evidence in the record that she used gauge pins during the inspection process (R4, tab 38 at 5).

9. On 22 June 2012, Mr. Fritz issued a Corrective Action Request (CAR) to MAP, requesting that MAP respond on or before 5 July 2012 with its analysis of the cause of the dimensional nonconformance and the action proposed to be taken to prevent a re-occurrence (R4, tab 7).

10. On 25 June 2012, MAP quality inspector Alberto Valenzuela conducted his own inspection of the holes in the rejected part. He recorded measurements from .190 to .196". (R4, tab 40)

11. The previous year, on 9 November 2011, Mr. Valenzuela had inspected the same part prior to sending the part to the government for inspection, and recorded a hole diameter of .194" at Step 4 of the manufacturing process (R4, tab 33). That same day, 9 November 2011, another MAP inspector performed an inspection of the same part at Step 5 of the manufacturing process and recorded the hole diameter as .191" (R4, tab 34).[7] Subsequently, on 21 November 2011, a third MAP inspector conducted an inspection on a sample of four parts out of a production run of 13 parts at Step 5 of the manufacturing process.[8] This inspector recorded a hole diameter of .191" for the four inspected parts. (R4, tab 35) Finally, on 30 January 2012, government QAR Gordon Gregory signed off on the First Article Test Report conducted by MAP prior to shipping the first article for government testing, commenting:

---

[7] From the information available in the record, it appears that Step 4 involves the drilling of the holes and Step 5 involves "MACHINE DE-BURR PER G-F101." Both of these steps precede the application of the required coating and primer. (R4, tab 36)

[8] MAP elected to manufacture the first article, the six production parts, and additional parts, for a total of one first article and twelve production parts, in one production run prior to first article approval (R4, tab 48 at 14).

5

VERIFIED CALIBRATION, VERIFIED PPP&M,
REVIEWED CERT PACKAGE, REVIEWED
INSPECTION RECORDS, REVIEWED CONTRACT
FOR EXCEPTIONS, WITTINESS [sic] DIMENSIONAL
INSPECTION & METHODS, RECOMMEND FAT
APPROVAL[.]

(R4, tab 37 at 2)  The dimension recorded for hole diameter in the FAT Report was
.191" for a sample of 4 out of 13, as inspected on 21 November 2011 (*id.* at 37).

12. On 19 July 2012, MAP responded to the DCMA CAR. MAP asserted that
the root cause of the nonconformance was damage caused by the government while
inspecting the part, pointing out that "144 holes in parts we have in stock made at the
same time were in tolerance and did not have paint removed from the holes." MAP
requested the opportunity to submit one of the production parts as a new first article
and requested that the government use "reasonable care" in inspecting it. (R4, tab 8)
Mr. Fritz responded on 23 July 2012 that MAP's response was unacceptable. He
stated: "I offered you the chance to prove your theory if you were willing to destroy
one of your stock parts at no expense to the government, to demonstrate. You
declined." (R4, tab 9 at 11) Mr. Fritz apparently agreed with Mr. Marin that forcing a
gauge pin through the hole, thereby removing the paint, would destroy the part.

13. On 19 July 2012, Ms. Lisa Hardy of DLA Aviation responded to
Mr. Marin's 20 June 2012 email (finding 6), requesting that he confirm MAP's
willingness to pay the first article re-testing fee of $651.07 as well as consideration of
$1,325.55 to re-establish the first article test date to 31 August 2012. She further
informed him that a no-cost cancellation of the order was an available option. He
responded the same day, stating that "[w]e certainly feel strongly this was a
Government caused disapproval and hope you will consider DCMA's
recommendation to resubmit at no additional cost. If not, then this is reluctantly
acceptable." (R4, tab 13 at 2-3)

14. Both parties agree that on 20 June 2012 in the presence of Messrs. Fritz and
Keeler, and again on 24 July 2012 in the presence of Mr. Robert Presley, DCMA
supervisory quality assurance specialist, MAP employees pulled production parts from
stock, used "go/no-go" gauge pins on them, and represented to the government
representatives that the parts were compliant (Fritz decl. ¶ 4; gov't br., ex. D,
Robert Presley decl. (Presley decl.) ¶ 3). It does not appear from the record that the
results of these inspections of the production parts were recorded, and both Mr. Fritz and
Mr. Presley stated they do not know the sizes of the gauge pins that were used (Fritz decl.
¶ 4; Presley decl. ¶ 3). None of these government representatives either questioned any
of the reported results, or performed any inspection themselves, despite having the
opportunity to do so (*id.*).

6

15. From the record, there appear to be at least two different ways of inspecting the dimensional compliance of holes: (1) using go/no-go gauge pins; and (2) actually measuring the holes. The go/no-go process was described by Mr. Valenzuela, a MAP inspector with over 30 years of experience, as follows:

> In my inspection I prefer to perform what I call a "hard gage" inspection of the parts. This involves the use of two gage pins, a go and a no-go pin. For the .190/.194" diameter I would use a .190" and make sure it goes into all the holes. Finally I would use a .194" and check to see it does not go into any of the holes (no-go condition). This shows passing results.

(App. supp. R4, tab 110, Valenzuela decl. ¶¶ 4, 6) Actually measuring the specific dimension of a hole appears to be more time-intensive and was described by Mr. Valenzuela as more likely to enlarge the holes than go/no-go inspection. Mr. Valenzuela stated:

> Measuring each and every hole in a part like this [referring to the flap track liner] can be done, but it takes a lot of time and can progressively make the hole larger, so I prefer not to do this.

(*Id.* ¶ 7) MAP also submitted for the record independent industry materials indicating that the use of go/no-go pin or plug gauges is an accepted method for inspecting the dimensional compliance of drilled holes on a pass/fail basis. For instance, the Meyer Gage Catalog states that:

> A GO gage is used to check the lower limit of a hole. A NOGO gage is used to check the upper limit of a hole. If the GO gage enters the hole and the NOGO gage is unable to enter, the design specifications of the hole have been met.

(R4, tab 108 at 3) The same source cautions that such gauges are used to inspect the holes for pass/fail compliance only, and will not measure the exact size of the hole (*id.* at 4).

16. On 25 March 2013 (there is no explanation in the record of what occurred, if anything, during the intervening eight months), DLA contracting officer (CO) Janice Hicks issued a show cause letter to MAP, inviting MAP to submit information bearing on whether the contract should be terminated for default, or a new delivery schedule should be established, within 10 days (R4, tab 11). MAP responded on 1 April 2013 that it had requested a no-cost resubmission and that it had enough parts in stock to immediately ship a first article and all production parts. It reiterated its position that the rejected first article was damaged during government inspection. (R4, tab 12 at 2) On 2 April 2013, CO Hicks

7

responded that the government could not approve a no-cost first article resubmittal unless MAP provided evidence of the rejected part being damaged by the government (*id.*). CO Hicks' request for evidence of government damage drew the following response from QAR Fritz:

> QAR Keeler and myself inspected the rejected part with Military Aircraft Parts personnel when the part was returned. We did not see any "clear and convincing evidence" that the government caused damage to the part during their test.
>
> We did observe the part was nonconforming. Just to be clear, DCMA at no time has recommended a no cost FA resubmittal.

(R4, tab 12 at 1)

17. On 5 April 2013, Mr. Marin responded to CO Hicks's invitation to submit evidence that the rejected part was damaged by the government by offering to return the damaged part to DLA "along with the 12 production parts that are in tolerance and undamaged. This will provide proof and assure that production parts are in tolerance at the same time." (R4, tab 14 at 2) CO Hicks responded the following Monday, 8 April:

> Rob
>
> You have one of 2 choices-
>
> 1. You can resubmit the FAT samples and pay the cost for FAT resubmittal.
> 2. DLA can proceed with Termination for Default.[9]
>
> I need a decision no later than 16 April 2013. If no response is received, then I will surmise that your decision was for DLA to proceed with Termination for Default.

On 17 April 2013, Mr. Marin responded that MAP agreed to the resubmittal and to pay the cost of re-testing. (R4, tab 14 at 1) That same day, Mr. Keeler emailed Mr. Marin and stated that MAP needed to make a new first article test part and could not use one

---

[9] In accordance with FAR 49.504(a)(1), the contract did not contain FAR 52.249-8, Default (Fixed-Price Supply and Service) (or any other Default clause). The inclusion of this clause was not required pursuant to FAR 49.504(a)(1) since the contract amount did not exceed the simplified acquisition threshold. *See* FAR 2.101.

of the parts from the prior production run, because "your FAT failed government inspection so all parts you made on the same run as the FAT are considered bad also" (R4, tab 15 at 1-2).

18. On 19 April 2013, DLA contract administrator Lee Skimin sent MAP contract Modification No. P00001 (Mod. P00001) containing a new CLIN and delivery date for the first article resubmittal (R4, tab 16 at 2, tab 2). Mr. Marin responded the following Monday, 22 April, that he was unsure how to proceed because:

> 2. On 6/20/12 we worked with our QAR to inspect all the holes in the 12 remaining parts, which we would like to use as our FA exhibit. All items were acceptable.
> 3. On 7/24/12 Randy's DCMA supervisor, Robert Presley, also came in and the same inspection was conducted. All holes were acceptable.
> 4. DCMA now wants to reject the parts with holes they observed to be acceptable, per the email below [the referenced email appears to have been deleted in the copy provided by the government for the Rule 4 file].
>
> The attached contract page seems to give the Government the option to reject the parts, though this appears counterproductive and cost prohibitive. Making new parts obviously would require additional time and cost.
>
> Is this something to address with your agency or DCMA? I would certainly like to resolve this without further conflict with DCMA.

(R4, tab 17 at 2) The "attached contract page" refers to Section B of Order No. SPM4A7-11-M-D111, which contains an unnamed, unnumbered, undated clause providing as follows:

> SAMPLING:
>
> 1. SAMPLING FOR INSPECTION AND TESTING SHALL BE IAW ANSI/ASQ Z.4-2008, DATED JAN 1, 2008. ANY ALTERNATE PLAN MUST BE APPROVED BY THE PCO. A SAMPLING PLAN THAT ACCEPTS ON ZERO DEFECTS IS REQUIRED.
>
> 2. ANY DEFECTIVE ITEM DISCOVERED DURING INSPECTION MAY BE CAUSE FOR REJECTION

9

OF THE ENTIRE CONTRACT QUANTITY.
CRITICAL APPLICATION ITEM.

(R4, tab 17 at 7, tab 1 at 4)

19. In response, CO Hicks emailed Mr. Marin on 23 April 2013, stating:

> We cannot accept a new FAT sample from production
> quantities where the FAT failed previously. The reason
> being is your FAT failed government inspection so all
> parts you made on the same production run as the FAT are
> considered bad parts. That is a risk that you assumed when
> you manufactured the entire production quantity at the
> same time that you produce[d] the FAT sample. You will
> need to produce a new FAT sample and if it passes, then
> you will need to produce new quantities.

(R4, tab 17 at 1) Neither CO Hicks nor Mr. Keeler specified any contract term underlying their refusal to accept a new first article made from the same production run as the disapproved first article.

20. On 2 May 2013, MAP and the government executed bilateral Mod. P00001 establishing a first article resubmittal date of 24 October 2013 (R4, tab 2). Mod. P00001 states in pertinent part:

> 3. To re-submit a First Article, reference DLA Aviation,
> FAWA Disapproval Letter, dated 19 JUN 2012. First
> Article re-submission is as follows: a. Revise the delivery
> date on CLIN 0002, formerly CLIN 9906 to 24 OCT 2013,
> for First Article re-submission. b. Contractor shall provide
> DLA Aviation with proof of delivery (DD250) and
> shipping documents that the First Article re-submission
> was shipped by the date above.
>
> 4. Revise the delivery date on CLIN 0001, Production
> Units, as indicated- 22 APR 2014- due to the time
> extension for the First Article re-submission.
>
> 5. Pursuant to FAR 52.209-4, the related costs are:
>
> Re-Testing Charges: $651.07
> Administrative Costs and Time Extension: Waived
> Total: $651.07

10

Consideration in the amount of $651.07 is accepted for this modification. For invoicing purposes, the contract value will not be changed. Therefore, when invoicing the contractor's invoice should NOT be adjusted to reflect this modification. To effectuate this modification, the payment office will offset the amount of this modification against any outstanding payments due, potentially including other contracts.

6. Pursuant to FAR 52.209-4 and the General Provision Clauses, if the First Article re-submission is not delivered by the date above, or if the First Article is disapproved (second disapproval), this contract may be terminated in its entirety at no cost to the Government.

Purpose of this modification is to authorize the Contractor to re-submit the First Article, accept the Contractor's consideration and to revise the delivery dates for the First Article and for Production, due to the Contractor's decision to re-submit a previously disapproved First Article.

(R4, tab 2 at 2) Mod. P00001 does not contain any requirement that the re-submitted first article be newly manufactured.

21. On 25 July 2013 MAP submitted a Request for Deviation/Waiver[10] requesting permission to submit a new first article using one of the parts previously made. MAP reiterated that the remaining parts had been inspected with pin gauges in DCMA's presence and found to be 100% compliant with the .190-.194" hole requirement. (R4, tab 19 at 1, tab 20 at 2)

22. On 29 July 2013, Mr. Raymond Thomas, who had replaced Mr. Fritz as the QAR assigned to MAP, responded requesting an "inspection record showing the exact dimensions of all the holes for the twelve parts that were made with this first article" (R4, tab 20 at 2). Mr. Marin sent an email to Mr. Valenzuela, asking "Can you supply this?" (R4, tab 41 at 1). Mr. Valenzuela then sent Mr. Marin a copy of the inspection he had performed of the first article back in November 2011 (*id.* at 1, 10). Mr. Marin responded, "We need a QD form for the 12 extra parts...not the 1 part we sent...can

---

[10] MAP asserts that it was directed by DCMA to file a waiver request as an alternative to manufacturing more parts (app. reply br. at 6). However, there is no evidence in the record supporting this assertion.

11

you help?" Mr. Valenzuela responded, "I can modify or create a new one because the rest of the parts was finished, same machine and same program." (R4, tab 42 at 1)[11]

23. Subsequently Mr. Marin sent Mr. Thomas an email with the message "See attached" (R4, tab 45). It is unclear from the Rule 4 file what was actually attached to his email. In any event, Mr. Thomas replied:

> Rob,
>
> Thank you for providing the inspection record from your sampling. However I will need an inspection record for each individual part that was made with the failed first article showing the actual measurements for each hole that is covered by .190-.194 DIA tolerance. Failure to provide the documentation by 1 Aug. will cause the waiver to be processed without this information.

(R4, tab 20 at 1)

24. Mr. Marin then emailed Mr. Valenzuela, commenting "This seems unreasonable...I think measurements of 144 holes is excessive and unnecessary. Any thoughts?" (R4, tab 111 at 8)

25. Mr. Thomas and Mr. Keeler visited MAP on 1 August 2013. Mr. Valenzuela declares that:

> I am sure I presented one new good part from inventory, sometime after the first article rejection, to DCMA QAR Greg Keeler. He said something to the effect of, "I'm good with that. All you need is a mod now." I believe this was on August 1st, 2013 to the best of my memory.

(R4, tab 110, ¶ 8) Mr. Marin states:

> I am unsure about the events that occurred when DCMA was at MAP's facility on 1 August 2013 for our regular weekly QAR witness of parts, which is the deadline QAR Thomas gave MAP to show inspection records ofr [sic] all the holes for parts in inventory. However, the

---

[11] While the dates on these emails are considered reliable, the times are not. Most of the emails are printed from government counsel's computer and it appears the computer may have converted the original times of the most recent email in each series from Pacific Time to Eastern Standard Time.

attached email from me [referring to his 29 July 2013 email quoted above] shows we knew inspection of all 144 holes in the good parts we had in stock could damage the .190/.194 holes and may be the reason we failed to perform the inspection. I believe this would be an issue we would likely address with DCMA on that date, but we have no other record of what transpired.

(R4, tab 111, ¶ 10)

26. Mr. Thomas's recollection of the 1 August meeting is as follows:

On August 1, 2013, I was at the MAP facility for a weekly meeting. I asked Mr. Marin if MAP had an inspection record showing dimensional measurements of all the holes in all of the parts and he said he did not.

(Gov't br., ex. E, Thomas decl. ¶ 4) The record does not include a declaration from Mr. Keeler.

27. On 5 August 2013, DCMA's Mr. Presley forwarded MAP's waiver request package to DLA's Mr. Skimin for final approval/disapproval action by DLA Aviation. In the forwarding email, Mr. Presley stated: "Please note our functional specialists have reviewed this waiver request and do not recommend approval." (R4, tab 21 at 1) By email dated 20 December 2013 (the delay is unexplained in the record), DLA notified MAP that its waiver request had been denied (R4, tab 22). Attached to the email were DCMA's comments on Form DD 1998. Mr. Thomas had commented, "I am not aware of any DCMA 100% inspection of the remaining twelve remaining [sic] parts. Requested the contractor provide inspection records for [sic] show the 100% compliance with the .194/.190 requirement. The contractor never provided the records." (R4, tab 22 at 5) There is no explanation in the record of why Mr. Thomas insisted on an exact measurement of each hole in all the parts, vs. a pass/fail inspection.

28. In a 20 December 2013 email, Mr. Skimin of DLA's contracting office informed MAP that:

Your RFW/RFD, dated 7/24/2013, has been denied. The First article exhibit did not conform to Technical Data Package requirements. Initial First Article disposition was "Disapproved". Pursuant to FAR 52.209-4(h), before first article approval, the acquisition of materials or components for, or the commencement of production of, the balance of the contract quantity is at the sole risk of the Contractor. Your firm has 2 remaining options: 1-resubmit a

13

conforming first article for government evaluation, as prescribed in Modification P000[0]1 dated 2 MAY 2013; or 2-take no action."

A response was requested by 27 December 2013. (R4, tab 22 at 1)

29. On 27 December 2013, MAP (Mr. Marin) responded in part:

> We respectfully reiterate our original position that the first article for this contract was erroneously rejected by the Government and the production parts we currently have in our possession, sufficient in quantity to satisfy the requirements of the entire contract, should be inspected and accepted. Delivery of production parts would occur when the final inspection paperwork is completed by MAP, within two weeks of Government notification of acceptance of this proposal.
>
> We also respectfully decline to manufacture a new lot of first article parts.

(R4, tab 23 at 1) Mr. Marin further articulated the view that since the nonconforming holes and the holes from which paint had been removed were the same holes, the observed discrepancy was easily correctable in production and the government should have conditionally approved the part. He stated that the government had failed to explain its basis for refusing to allow other parts manufactured at the same time to be used for a new first article submission and, while he assumed that the government was relying on the contract clause stating that "any defective item discovered during inspection may be cause for rejection of the entire contract quantity," he did not believe that clause applied to the current situation but to instances where latent defects may be present in production parts or fraud or misrepresentation had occurred. (*Id.* at 1-2)

30. The record does not indicate whether the CO responded to Mr. Marin's email, other than to withdraw the purchase order for failure to meet the first article delivery date by unilateral Mod. P00002, effective 13 January 2014 (R4, tab 3). On 21 April 2015, MAP submitted its claim for breach of contract, alleging breach of the implied duty of good faith and fair dealing and seeking as damages restitution of the cost incurred to manufacture the parts ($10,591.42) plus the $651.07 paid to DLA as consideration for Mod. P00001 (R4, tab 25). The claim was denied by CO Hicks on 13 May 2015 (R4, tab 26), and this appeal followed.

31. MAP's inspection of the first article as well as other parts in the same production run before the first article was shipped to the government for first article testing consistently recorded conforming hole diameters ranging from .191 to .194

14

inches (finding 11). Government QAR Gordon Gregory signed off on MAP's first article test report on 30 January 2012 expressly noting that he had witnessed the dimensional inspection and methods and recommending FAT approval (*id.*). The contract required that cadmium plating and epoxy-polyamide primer be applied to the part as part of the manufacturing process prior to shipment and testing of the first article (finding 1). The first article and all the other parts manufactured in the same production run therefore had both cadmium plating and primer applied prior to shipment of the first article to the government for testing.

32. After inspection, the government's dimensional technician reported that instead of the required dimension of .190 to .194 inches, the diameter of the holes was .195 to .196 inches "[in] twelve places." This was the only respect in which the first article did not meet contract requirements. (Finding 3) When the disapproved first article part was returned to MAP for inspection in the presence of the DCMA QARs on 20 June 2012, only three holes out of the total of twelve holes were found to be .195 to .196 inches in diameter, while the remaining nine were the required .190 to .194 inches in diameter (finding 5). The three nonconforming holes all had paint missing (*id.*). The nine holes that did not have paint missing were measured as conforming (*id.*).

33. The government does not dispute either that the nine holes without paint removed were conforming, or that all three nonconforming holes had paint missing. When Mr. Marin of MAP observed following the 20 June 2012 inspection of the returned part that the nonconforming condition could have been caused during the government inspection by forcing a gauge pin through the holes, thereby removing the paint, government QAR Fritz found this theory plausible, but unlikely (finding 5). The government's dimensional technician, on the other hand, while denying that she forced a gauge pin through the holes, stated that it is possible paint was removed during the inspection process and that the removal of paint would be a "typical" result of the inspection process (finding 7).

34. Based on the ESA technician's use of pin gauges during the inspection process (finding 8), her admission that paint could have been removed during her inspection and that such a result would be "typical," the evidence of record that pin gauges are not suitable for exact hole measurement because they tend to enlarge the hole (finding 15), the fact that a dimensional discrepancy of only two thousandths of an inch (.196 vs. .194) separated the failing holes from the passing holes, and the fact that paint was missing from the failing holes and only from the failing holes, we find that it most probable that the technician attempted an exact measurement of three holes with gauge pins, removing paint in the process, and then extrapolated the results to the other holes. Based on the evidence that the holes met the required dimensions prior to being shipped to the government for testing (finding 11) and no other discrepancies were noted in the inspection process (finding 3), we further find that MAP's first article met all contract requirements and that the dimensional discrepancy that resulted

15

in the disapproval of MAP's first article was caused by the government's own inspection process.[12]

35. The contract in this case was a unilateral purchase order which by its terms lapses if complete performance in accordance with the offer's terms and conditions is not tendered. We find that MAP first tendered performance that met the offer's terms and conditions on 30 January 2012, when it shipped its first article for government inspection (finding 3). Thus, the unilateral purchase order was converted to a contract as of that date.

36. In finding that the first article met the contract requirements, we necessarily reject the government's argument that the 12 holes in MAP's first article part were required to meet the specified dimensions after paint was removed. The government has not directed us to any contract provision supporting this argument, and we have found none. To the contrary, the contract required that a cadmium coating and primer both be applied to the part before shipping it for inspection (finding 1), and thus we find that the contract required the dimensional requirement to be met with paint, not without.

37. Because MAP's first article met all contract requirements when shipped to the government (finding 34), we find that the CO's disapproval of that first article was improper. We also find that the CO's subsequent failure to acknowledge (1) that the government's own inspection process removed paint from three holes in MAP's part, causing them to be out of tolerance, and (2) that the remaining parts in MAP's inventory were in tolerance and acceptable, was unreasonable based in part on information known to her and in part on information known to the DCMA QARs whose knowledge is imputed to her. The QARs knew or had reason to know, either from the initial inspection of the first article part (findings 11, 31), or from the subsequent inspections of the disapproved first article compared to other parts manufactured at the same time (findings 5, 32), that the first article was damaged while in the government's possession and that the parts from the same run that MAP had in stock were fully acceptable under the contract.[13] The CO herself was personally

---

[12] With respect to our finding that MAP's first article met the contract requirements, we note that the government has introduced evidence of difficulties MAP encountered at the outset in manufacturing this part. MAP has explained in a supplemental declaration from Mr. Marin that its first attempt at production employed two inexperienced machinists due to a labor shortage (app. reply br., ex. F ¶ 8). The second production run from which the first article was submitted employed two experienced machinists and no notable problems were encountered (*id.*). The government has not introduced any evidence that MAP experienced any difficulties in manufacturing the first article that was actually submitted.

[13] The record does not reveal whether or not this information was actually shared with her.

16

aware from MAP's contract correspondence that MAP contended its first article had been damaged by the government and that its remaining parts were acceptable, yet rejected MAP's offer to deliver the parts and let the government see for itself (findings 16-17).

38. Once MAP executed Mod. P00001 establishing a new first article delivery date, it submitted a request for waiver/deviation again seeking the government's concurrence that it could submit an existing part as its first article. Raymond Thomas, the then-QAR, responded requesting an inspection record "showing the exact dimensions of all the holes for the twelve parts that were made with this first article." (Findings 21, 22) QAR Thomas provided no explanation to MAP of why exact measurement of the diameter of each hole in each part was needed to determine the dimensional compliance of the holes, and none otherwise appears in the record (finding 27). From the evidence of record (findings 7, 17), the Board concludes that pass/fail inspection using go/no-go gauges would have provided the government with adequate assurance that the holes were compliant, and, moreover, that exact measurement posed a risk of enlarging the holes and destroying what otherwise would have been a good part, as happened in the initial government inspection. Thus, we find the QAR's insistence on exact measurement of each of 144 holes to have been unreasonable, and the CO's denial of MAP's waiver request based on its failure to conduct an exact measurement of 144 holes to also have been unreasonable.

39. The CO's failure to acknowledge that government-caused damage to MAP's first article was the sole cause of its disapproval led directly and inevitably to her subsequent actions we find to have been unreasonable: the CO's failure to allow MAP a no-cost resubmittal (findings 16-17); the CO's imposition of a requirement that MAP manufacture a new part for the re-submittal (findings 18-19); the CO's denial of MAP's waiver request based on MAP's failure to comply with DCMA's unreasonable requirement to measure all 144 holes (findings 22, 27); and, ultimately, the CO's unilateral cancellation of the contract in January 2014 (finding 30).

## DISCUSSION

MAP asserts that the government was not justified in disapproving its first article part because the government's unduly forceful inspection damaged the three holes found to be nonconforming. MAP also asserts that by insisting that the hole dimensions *without* paint meet the specified dimensions, the government imposed a more stringent or different inspection standard in its inspection of MAP's first article than provided for in the contract. In their totality, MAP asserts, the government's actions in this case violated the implied duty of good faith and fair dealing and constituted a breach of contract. MAP asserts entitlement to restitution, to restore it to the *status quo ante* (as if there never had been a contract that was breached), in the amount of $11,242.49. (R4, tab 25; app. br. at 9-16)

17

The government asserts at the outset that the unilateral purchase order at issue in this appeal, as modified by bilateral Mod. P00001, required delivery of a first article by 24 October 2013, and since MAP failed to do so, the CO was justified in cancelling the order (gov't br. at 24-25). The government acknowledges that MAP's position is that the CO abused her discretion in not allowing MAP to resubmit a first article using one of the production parts it had already manufactured (*id.* at 25). The government's response to this is in two parts: first, the government argues that MAP agreed to submit a newly manufactured first article by entering into Mod. P00001 after being informed by government representatives that only a newly manufactured first article would be acceptable (*id.* at 25-26). Secondly, the government argues that, aside from Mod. P00001, the contract clause specifically stating that any defective item discovered during inspection may be cause for rejection of the entire contract quantity gave the CO the right to decide not to accept any parts made in the same production run as the disapproved first article (*id.* at 26).

As to the issue whether the government was justified in disapproving the initial first article, the government first argues that MAP is foreclosed from contesting this issue by having entered into Mod. P00001, citing *James Electronics, Inc.*, ASBCA No. 43505, 93-2 BCA ¶ 25,677 at 127,728 (by agreeing to a new delivery schedule after two failed first article submissions, appellant surrendered its right to argue any then existing causes as a defense to its failure to deliver an acceptable first article on the third submittal) (*id.* at 30-31). Secondly, the government states that the disapproval, if reviewable, was correct because the holes in the part were oversized and MAP has not met its burden of proving that this defect was easily correctable in production (*id.* at 32-33).

To recover on its breach of contract theory, MAP must show (1) a valid contract between the parties; (2) an obligation or duty of the government arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach. *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Northrop Grumman Systems Corporation Space Systems Division*, ASBCA No. 54774, 10-2 BCA ¶ 34,517 at 170,237. We consider each of these elements in turn.

*1. A valid contract between the parties.* The contract in this case was a unilateral purchase order. As such, as a matter of law, it constitutes an offer to buy certain supplies on specified terms and conditions if the offer is accepted by delivering those supplies on or before the date specified. If complete performance in accordance with the offer's terms and conditions is not tendered, the offer lapses by its terms. *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,082. We have found that MAP did tender acceptable performance (finding 35). Therefore, Order No. SPM4A7-11-M-D111 was a valid contract between the parties.

*2. An obligation or duty of the government arising out of the contract.* The government was obligated to evaluate MAP's first article in a reasonable manner in accordance with the terms of the contract. First articles are typically not production items

and, unlike production items, which are either accepted or rejected, first articles are either approved, conditionally approved, or disapproved. *Military Aircraft Parts*, ASBCA No. 59978, 15-1 BCA ¶ 36,101 at 176,258; *see also* FAR 52.209-4, FIRST ARTICLE APPROVAL – GOVERNMENT TESTING (SEP 1989) clause, which was included in the contract (finding 2): "Within 120 calendar days after the Government receives the first article, the Contracting Officer shall notify the Contractor, in writing, of the conditional approval, approval, or disapproval of the first article" (*id.* ¶ (b)). This clause is prescribed for use in contracts by FAR Part 9, Contractor Qualifications, which in Subpart 9.3, First Article Testing and Approval, sets forth the purpose of first article testing, which is to ensure that a contractor "can furnish a product that conforms to all contract requirements for acceptance." FAR 9.302.

The first article clause does not give the government the right to disapprove a first article for any noncompliance with specifications that would be a valid reason for rejection of supplies tendered for delivery under the contract. *Marvin Engineering Co.*, ASBCA No. 27016, 84-2 BCA ¶ 17,401 at 86,674. Ordinarily, the primary purpose for requiring first article submission is to prove the capability of the contractor to produce end products that will meet contract requirements. *Id.* (citing *Astro Science Corp. v. United States,* 471 F.2d 624 (Ct. Cl. 1973); *Farris and Company*, ASBCA No. 31275, 73-1 BCA ¶ 9963)). Deficiencies in a first article that are correctable in production are not a valid basis for an outright disapproval and, in recognition of this, the first article approval clause expressly provides for conditional approval. *Id.*

First article testing and inspection of supplies have distinctly different purposes. As noted above, the purpose of first article testing is to determine whether the contractor can produce the supplies to the contract specifications. FAR 9.302. FAR Part 9 governs contractor qualifications and prescribes the use of the first article testing clause, FAR 52.209-4, under which deficiencies in a first article that are correctible in production are not grounds for disapproval. The purpose of inspection of supplies, on the other hand, is to determine whether production parts that have been delivered should be accepted. FAR Part 46, Quality Assurance, governs the inspection of delivered supplies and services.

In addition, both parties to the contract owe each other the implied duty of good faith and fair dealing. In *Metcalf Construction Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014), the United States Court of Appeals for the Federal Circuit affirmed the basic principle that the parties to a government contract are under a duty of good faith and fair dealing in the performance and enforcement of the contract, and that failure to fulfill that duty constitutes a breach. "The covenant of good faith and fair dealing...imposes obligations on both contracting parties that include the duty not to interfere with the other party's *performance* and not to act so as to destroy the *reasonable expectations* of the other party regarding the *fruits of the contract.*" *Id.* at 991 (citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

19

In order to prove a violation of the duty, a contractor need not necessarily prove that the government specifically targeted action to obtain the benefit of the contract or that the government's actions were undertaken for the purpose of delaying or hampering performance of the contract. *Metcalf*, 742 F.3d at 993. Rather, the implied duty of good faith and fair dealing is "limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Id.* at 991.

*3. A breach of the duty.* Based on the record before us, we have found that MAP's first article met all contract requirements, including hole diameter, when shipped to the government. Were it not for the damage caused to the first article while in the government's possession, there would not have existed any reason not to approve the first article. Thus, the CO's disapproval of the first article submitted by MAP on 30 January 2012 was unreasonable. In addition, the CO's refusal to allow MAP to submit another part from the same production run for re-testing, the after-the-fact imposition of a requirement that the holes in the part meet the dimensional requirement without paint, and the insistence that MAP conduct exact measurements of all 144 holes before a waiver would be considered, had no basis in the contract and were unreasonable. (Findings 37-39)

These acts were in violation both of the government's duty to evaluate MAP's first article in accordance with the express terms of the contract, and its implied duty to cooperate and not willfully or negligently hinder the contractor's performance. *American Ordnance LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,795 (citing *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988)). We impute to the CO the knowledge of her representatives, the DCMA QARs, in finding the government's conduct to have been a breach of the duty of good faith and fair dealing. *Walter Straga*, ASBCA No. 26134, 83-2 BCA ¶ 16,611 at 82,617-18.

We find inapposite the government's argument that our holding in *James Electronics* forecloses MAP from contesting the CO's disapproval of the first article. In that case, we held that the government had met its burden to show that the submitted first article, on a third submission, failed to meet contract requirements, and that the contractor had not met its burden to show that the defects were easily correctable in production. 93-2 BCA ¶ 25,677 at 127,728. In connection with the latter holding, we observed:

> To the extent that appellant's brief concentrates upon initial problems in appellant's obtaining copies of pertinent specifications and differences in test configuration when the second FA submittal was rejected, as excusable causes for default, it is unavailing. The law is clear that by agreeing to a new delivery schedule, which

20

appellant did in the fall of 1990, long after the first two FA rejections...it surrendered its right to argue any then existing causes as a defense to its failure to deliver an acceptable FA on its third submittal.

*Id.* In stark contrast, in this case MAP contends, and the preponderance of the evidence shows, that MAP's first article did meet contract requirements when first submitted. MAP is not presenting "defenses" to a failure to deliver an acceptable first article because there was no such failure.

We also reject the government's contention that CO Hicks was justified in requiring a newly manufactured first article because the contract included a clause stating that any defective item discovered during inspection may be cause for rejection of the entire contract quantity (gov't br. at 26). This clause, reproduced in full at finding 18, refers to "SAMPLING FOR INSPECTION AND TESTING," and states that "ANY DEFECTIVE ITEM DISCOVERED DURING INSPECTION MAY BE CAUSE FOR REJECTION OF THE ENTIRE CONTRACT QUANTITY." This language contemplates that a production lot will be delivered and items (the sample) will be selected from that lot for testing that will result in acceptance or possibly rejection of the entire lot. In contrast, the contract's first article testing clause, which applies in this case, calls for the delivery of an item or items that are not expected to be part of a production lot and which are inspected for the purpose of determining whether the contractor has the capability of producing items that meet the contract requirements. If the first article is approved or conditionally approved, then the contractor is given the opportunity to deliver the production quantity.

In order to shed light on the applicability of this clause to first article testing, the government was directed to supplement the record in this appeal with more information about the provenance of the clause. In response, the government informed the Board that the language of the clause is not part of any standard contract clause, and that it is included in Section B of the contract as part of the "standalone narrative terms of the contract" (Bd. corr. file, ltr. dated 9 February 2016). The government also provided the Board with an electronic link to the archived version of the DLAD in effect at the time the contract was issued (representing that the full DLAD comprised approximately 750 pages). The government stated further:

> With respect to the Board's question about whether the clause applies to first article testing or production lot testing, Respondent's position is that the plain terms of the clause state that it applies to inspection ("Any defective item discovered during inspection...") and there are two inspection points identified in the contract – the first article inspection and the production quantity inspection. Se[e] R4 Tab 1 at 2 ("FAT:Inspection=Origin, Acceptance=

21

Destination; Remaining Production: Inspection/Acceptance=Origin). Respondent further notes that the contract does not contemplate production lot testing as there is no Production Lot Test clause in the contract. *See* DLAD 52.209-9026, Production lot test (PLT) (http://farsite.hill.af.mil/archive/Dlad/Rev5_PROCLTR10-40/Part52.htm).

(Bd. corr. ltr. dtd. 22 February 2016)

The Board agrees that the contract does not contain the cited production lot testing clause. This makes sense, since the contract calls for first article testing, not production lot testing. The contract's first article testing clause, FAR 52.209-4, provides that following first article disapproval, if the government requests it, the contractor shall submit an additional first article for approval (finding 2). Nothing in the first article clause gives the government the right to dictate that only a newly manufactured part may be submitted as the additional first article. Nor does the non-standard contract language on which the government relies, as explained below.

The Board's review of the archived DLAD revealed that, subsequent to the issuance of the subject contract, pursuant to PROCLTR 11-45, PRODUCTION LOT TEST (PLT) (JAN 2009) clause, DLAD 52.209-9026, was removed and replaced with new clauses: DLAD 52.246-9085, PRODUCTION LOT TESTING (PLT) – GOVERNMENT (JUL 2011); and DLAD 52.246-9086, PRODUCTION LOT TESTING (PLT) – CONTRACTOR (JUL 2011), Furthermore, the production lot testing clause (JUL 2011) contains language very similar to that on which the government relies:

> (e) Upon completion of the PLT sample testing, the Government test facility will provide the results to the FAT/Testing Monitor (or ACO) and to the Contracting Officer. If the PLT sample is disapproved, the Government shall advise the Contractor of the nonconformance, and whether the Contractor will be allowed to produce a new lot to tender for testing. *Disapproval of the PLT sample is grounds for rejection of the entire production lot produced.* The Contractor shall discard any failed production lot produced and produce a new production lot under the contract terms and conditions. [Emphasis added]

22

http://farsite.hill.af.mil/archive/Dlad/Rev5_PROCLTR11-45/PART52.htm. The quoted language is essentially unchanged in the current version of the production lot testing clause.[14]

As discussed above, the non-standard contract clause relied on by the government, on its face, appears inapplicable to the first article testing process contemplated in the contract's first article clause. This, combined with the fact that substantially the same provision was incorporated in the 2011 production lot testing clause, leads the Board to conclude that the non-standard clause incorporated in the contract does not apply to first article testing and may not be invoked by the government to justify its imposition on MAP of requirements not authorized in the contract's first article testing clause. Moreover, even if we found that the clause properly applied to first article testing, it speaks in permissive, not mandatory terms. Under the facts and circumstances present in this case—where the part was damaged while in the government's possession and there was, therefore, no rational basis for concluding that the remaining parts manufactured by MAP were defective—it would still be unreasonable and an abuse of discretion for the government to require MAP to manufacture a new run of parts for a first article re-submission. In conclusion, the CO's insistence that MAP incur the expense of a whole new production run in order for the government to conduct another first article test was an unreasonable imposition of yet another obstacle to contract performance and a breach of the government's implied duty to cooperate and not hinder performance of the contract.[15]

Ultimately, CO Hicks cancelled the purchase order after MAP insisted on its right under the contract to submit an existing part for the first article re-testing (finding 30). This action was also a breach of the contract, since MAP had effected delivery according to the terms of the contract by tendering a conforming first article.

---

[14] The Board also finds it significant that both the production lot testing regulatory provisions and the related contract clauses were moved from Part 9 of the DLAD, which addresses Contractor Qualifications, to Part 46, which addresses Quality Assurance. This underscores the distinction in process and purpose between first article testing to qualify a contractor to produce a part, and inspection of delivered supplies to determine their acceptability.

[15] We also reject the government's argument that MAP nevertheless agreed to provide a newly manufactured first article by entering into Mod. P00001 after being informed by a government representative that a newly manufactured first article would be required (gov't br. at 25-26). Mod. P00001 on its face did not require MAP to submit a newly manufactured first article, and MAP did not otherwise acquiesce to the government's demand. The government has not met its burden of proof on this issue. *DTC Engineers & Constructors, LLC*, ASBCA No. 57614, 12-1 BCA ¶ 34,967 at 171,899.

23

While we find numerous breaches, both of express contract duties and the implied duty of good faith and fair dealing, we do not find that any of the government officials involved acted with malice or specific intent to injure MAP.

4. *Damages caused by the breach.* The contract's First Article Testing clause provides that the contractor assumes the risk of any production parts manufactured prior to first article approval; the cost thereof shall not be allocable to the contract for purposes of progress payments or termination settlements (finding 2). In this case, neither progress payments nor a constructive termination for convenience are presented. Because the contract did not contain the standard Default clause, FAR 52.249-8, even if we were to conclude that the CO's cancellation of the contract equated to an improper termination for default, the government cannot avail itself of the conversion of an improper default termination to a termination for convenience provided for by paragraph (g) of that clause.[16] This being so, paragraph (h) of the First Article Testing clause is not applicable and MAP is entitled to breach damages.

The contract price of $7550.00 included 1 first article and 6 production parts. MAP elected to make 13 parts altogether in one production run, and claims its costs of manufacturing all 13 parts ($10,591.42) plus $651.07 paid to DLA as consideration for Mod. P00001 (R4, tab 25). We have found that the government breached the contract and its actions prevented MAP from successfully delivering conforming parts. Thus, the appropriate measure of foreseeable damages flowing from the government's breach is the contract price, $7,550.00.

We do not grant MAP the full amount of its requested damages. The contract only called for six production parts and it would be sheer speculation that it would have ordered six more. As to the amount of $651.07 MAP agreed to as consideration for the government's agreement to a first article resubmission, MAP has not met its burden to show this amount was ever paid to or collected by the government.[17]

Accordingly, this appeal is sustained in part.

---

[16] Because the Default clause was not required to be included (*see* fn. 9 above), it is not incorporated into the contract by operation of law. *American Water Cooling Equipment Corp.*, GSBCA No. 9083-TD, 89-1 BCA ¶ 21,364 at 107,689; *compare Turnco Machine Co.*, ASBCA No. 33559, 88-2 BCA ¶ 20,551 (FAR 52.249-8 required and incorporated by operation of law).

[17] The government contends this amount was never charged to MAP (gov't br. at 34). MAP counters that this amount was deducted from other amounts due and owing to MAP per the terms of Mod. P00001. Mod. P00001 states that "the payment office will offset the amount of this modification against any outstanding payments due, potentially including other contracts" (R4, tab 2 at 2). We cannot find any evidence in the record that the amount was actually collected from MAP.

## CONCLUSION

For the foregoing reasons, we sustain the appeal in the amount of $7,550.00, plus interest pursuant to 41 U.S.C. § 7109 calculated from 21 April 2015 until paid.

Dated: 31 May 2016

LYNDA T. O'SULLIVAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60009, Appeal of Military Aircraft Parts, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

25